Courtney H. JOHNSON, Appellant,

v.

UNITED STATES, Appellee.

No. 07–CF–1226.

District of Columbia Court of Appeals.

Argued Nov. 12, 2009.
Decided March 22, 2012.

Marc L. Resnick for appellant.

Richard DiZinno, Assistant United States Attorney, presented argument for appellee. Jeffrey A. Taylor, United States Attorney at the time the brief was filed, Roy McLeese III, Florence Pan, Joseph Patrick Cooney, and J. Thomas Spiggle, Assistant United States Attorneys, were on the brief for appellee.

Before THOMPSON, Associate Judge, RUIZ, Associate, Retired,* and NEBEKER, Senior Judge.

---

* Judge Ruiz was an Associate Judge of the court at the time of argument. Her status

RUIZ, Associate Judge, Retired:

Courtney Johnson was convicted in a bench trial of misdemeanor possession with intent to distribute a quantity of marijuana, in violation of D.C.Code § 48–904.01(a)(2)(B), after two juries failed to reach a verdict on a felony charge based on the same evidence. He claims on appeal 1) that law-enforcement officials lacked probable cause to arrest him when they made a "controlled delivery" to him of a package they knew contained drugs and, therefore, the search of his car and seizure of evidence that occurred incident to that arrest violated his Fourth Amendment rights; 2) that a post-arrest statement he made on the scene was procured in violation of his *Miranda* rights; and 3) that the trial court erred in denying his motion for judgment of acquittal because the government's evidence was insufficient to prove that he possessed and intended to distribute drugs. We conclude that none of Johnson's claims of error requires reversal of his convictions, which we therefore affirm.

## I. Statement of Facts

On August 19, 2004, an analyst with the United States Postal Service was "profiling" parcels in a facility near the Los Angeles, California, airport, when he discovered a parcel that contained approximately 3,000 grams of marijuana. Less than a week later, on August 25, the same postal inspector noticed a parcel with a return address identical to the one that was listed on the parcel recovered on August 19. Inspector King, another postal inspector, found that the return address on the second parcel was valid, but that the sender's listed name, "John Johnson," was "fictitious." Law-enforcement officers determined that the individual who mailed the two parcels was Ricardo Austin.

After a police dog, "Arco," gave the second parcel a "positive hit," the postal inspectors obtained a warrant to open it. They found two packages inside the parcel, one weighing approximately 5 pounds and the other weighing 11 pounds, of a substance that field-tested positive for marijuana. The packages were wrapped in Saran Wrap and dryer sheets, in an apparent attempt to mask the odor of the drugs. Law-enforcement officers removed the 5–pound package, but shipped the 11–pound package in the original parcel to a federal facility in Maryland. The net weight of the marijuana was approximately 4,797 grams.

Postal inspectors informed Detective Zerega of the D.C. Metropolitan Police Department that the parcel was addressed to "Corey Johnson" at 4604 Nannie Helen Burroughs Avenue, N.E., Washington, D.C., and that while the address was valid, no one named "Corey Johnson" was known to be associated with that address. Officers obtained a court order to install a device in the package that would notify officials if the parcel was opened. Law-enforcement officers then obtained an anticipatory search warrant for the Nannie Helen Burroughs address and decided to conduct a controlled delivery of the package.

At approximately noon on August 27, 2004, Inspector Green, disguised as a U.S. Postal Service courier, parked a delivery van in front of the Nannie Helen Burroughs address. Other officers were arrayed around the house, out of sight. Inspector Green approached the house, with the parcel in hand, and knocked on the door. Johnson, wearing only his underwear, answered. Green and appellant differ as to what happened next.

changed to Associate Judge, Retired, on September 1, 2011.

According to Inspector Green, when he asked appellant if he was "Corey Johnson," appellant "nodded his head . . . gesturing that he was." Green then told Johnson to "take care of your business," indicating that Johnson should get dressed. Appellant shut the door, dressed, and returned to the front door. Green testified that when appellant came back out, he repeated the question, whether he was "Corey Johnson," and appellant again indicated that he was. Green then asked appellant to sign and print his name on a delivery-confirmation form. Appellant signed and printed his name as "Corey Johnson."

According to appellant, when the postal courier (Inspector Green) first asked him if he was "Corey Johnson," appellant responded: "I'm not; my name is Courtney Johnson." Appellant testified that Green then said, "They could have made a mistake." Once he returned to the door after having dressed, appellant repeated, "I need to show you my I.D. [because] that's not me. My name is Courtney Johnson." Appellant testified that he also told Green that he did not expect anything to be delivered to him that morning. Green, with a "grin on his face," told him, "You can go ahead and sign." Appellant explained that Green did not want to see his I.D. and that because Green was "kind of being persistent," appellant signed his initials, "C.J.," which "represent[ed] 'Courtney Johnson.'" According to appellant, he told Green that "[t]his is kind of weird," referring to how he was being "coerced" to sign the document.

After the inspector left, appellant felt "real leery about the whole situation," and decided to call Sergeant Shields, an ac-

quaintance of his who was in law enforcement.[1] According to appellant, he decided to take the package to a nearby post office to return it. Ten to fifteen minutes after the package had been delivered, he came out of the front door of the house with the parcel in his hand and walked toward his car, which was parked in the driveway. He put the package in the car on the front passenger seat and, as he attempted to enter the driver's side, officers tackled him to the ground and handcuffed him.

Inspector Green returned and identified appellant as the person who had received the package and said that he was "Corey Johnson." Officers then searched the car, where they found the unopened parcel, as well as several documents in the front passenger side of the car and in the glove compartment. The documents included "personal papers with [appellant's] name"; a PEPCO bill; a T–Mobile phone bill that matched the number for the cell phone recovered from appellant; and a notice from the Department of Motor Vehicles with the name "Constance Christian,"[2] addressed to the Nannie Helen Burroughs address and, in handwriting, "Corey Johnson."

Approximately ten minutes after officers seized and handcuffed appellant, Detective Zerega placed him in the back seat of the detective's SUV. According to Zerega, appellant was asked for "preliminary information . . . [like] his name and address so that [they could] complete [their] sheets." Appellant was not asked about the package they had recovered from the car. Appellant inquired what he was being arrested for, and an officer told him that it was "for the package." According to Officer McFadden, appellant then "spontaneously"

---

1. No other proof was presented at trial regarding appellant's call made to Sergeant Shields.

2. Constance Christian was Johnson's girlfriend at the time of the arrest. She lived at the address where the package was delivered.

said, "[I]t's nothing but crushed cookies and medication; go ahead and test it." Appellant was told, "[Y]ou know we're going to talk about the incident and everything when we get down to the precinct." Appellant denied that he had said anything about what was in the package, only that he was on his way to return it to the post office. Appellant was taken to the police station where an officer read him his *Miranda* rights, which he waived. At the station, appellant stated that the parcel was not his and that he was "Courtney," not "Corey," Johnson.

Following appellant's arrest, officers searched the house where they had made the controlled delivery, with the consent of the owner, but did not find anything incriminating. The cell phone recovered from appellant indicated that calls were made from the phone to numbers in the state of California, but no connection was made between these numbers and any California phone numbers known to be used in drug transactions. Officers also determined that appellant's principal address was on 6th Street, S.E., in Washington, D.C.

The same day the investigators conducted the controlled delivery in D.C., drug-enforcement officers in California searched an address (432 Regeant Street in Englewood, California) that officers had tracked to Ricardo Austin, the sender of the two intercepted parcels. Officers recovered marijuana, Saran Wrap, dryer sheets, "ledgers," postal-delivery receipts, and money orders at Austin's address. One of the postal-delivery receipts was to "Corey at 46014 North H. Burroughs Ave., N.E., Washington D.C." Another receipt included the address "2027 Barlow Place, Hyattsville, Maryland." A week later, Au-

gust 31, officers obtained a search warrant for the Barlow Place address and found there a box with the same handwriting and return address as the one shipped to Corey Johnson at the Nannie Helen Burroughs address; money-order receipts totaling $50,000; one-half pound of marijuana; and $10,000 in cash. Officers also found a "tally sheet" that included "gross amounts . . . that they're going to be sending . . . back to California, with an entry that stated 'from Courtney Johnson, 2027 Barlow Place,' written on it." Using the serial numbers on the money-order receipts recovered from the Barlow Street address, law-enforcement officers obtained digital images of the corresponding money orders. Four money-order receipts were from "Courthney Johnson at 2027 Barlow Place" to "Ricardo Austin" at "423 West Regeant Street in Englewood," totaling $3,500. Law-enforcement officers were also informed that another postal inspector, who profiled parcels in Baltimore, had in her files an express-mail receipt from a sender "Courthney Johnson, 2027 Barlow Place in Hyattsville, Maryland" to "Abraham Flores at 2535 Iowa Avenue, Southgate, California."

On August 28, 2004, appellant was charged with one felony count of unlawful possession with intent to distribute ("PWID") a controlled substance (marijuana), in violation of D.C.Code § 48–904.01(a)(1) (2001). On March 4, 2005, appellant filed a motion to suppress evidence and a motion to suppress statements. Neither motion was granted. Appellant was tried twice before a jury, and both trials ended in mistrials due to hung juries. On January 17, 2007, the government abandoned the felony charge, and instead filed an information charging appellant with misdemeanor PWID.[3] At the end of

3. The original complaint, filed on December 1, 2004, charged appellant with PWID of

more than half a pound of marijuana, which carries a penalty of up to five years' imprison-

the bench trial presided by Judge Jeanette J. Clark, appellant made a motion for judgment of acquittal, which the trial judge denied, finding appellant guilty of the misdemeanor PWID charge. Appellant was sentenced to 180 days' incarceration, with execution suspended to 130 days, and one year of supervised probation. He appeals Judge Diaz's denials of the two suppression motions filed before the two jury trials on the felony charge, as well as Judge Clark's denial of the motion for judgment of acquittal in the misdemeanor bench trial.

## II. Probable Cause to Arrest

■ Appellant claims that because law-enforcement officials lacked probable cause to arrest him, the search of his car and seizure of evidence that occurred incident to that arrest violated his Fourth Amendment rights.

■ The Fourth Amendment requires that an arrest be supported by probable cause. *Perkins v. United States*, 936 A.2d 303, 305 (D.C.2007) (citing *United States v. Watson*, 423 U.S. 411, 417, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976)). In reviewing a trial court's decision to deny a motion to suppress, we have defined our role as "[e]ssentially ... to ensure that the trial court had a substantial basis for concluding that no constitutional violation occurred." *Dickerson v. United States*, 677 A.2d 509, 512 (D.C.1996) (citing *Brown v. United States*, 590 A.2d 1008, 1020 (D.C.1991)). We do not disturb the trial judge's factual findings unless they are clearly erroneous or not supported by the evidence, and we draw all reasonable inferences in favor of sustaining the trial court's ruling. *See Blackmon v. United States*, 835 A.2d 1070,

1073 (D.C.2003). Whether the police had probable cause on a given set of facts is a question of law we review *de novo. See Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

■ "The classic formulation is that probable cause exists where the facts and circumstances within[ ] the officers['] knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Perkins*, 936 A.2d at 306 (citing *Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)) (quotations omitted). "To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003) (quoting *Ornelas*, 517 U.S. at 696, 116 S.Ct. 1657). "Probable cause must be supported by more than mere suspicion but need not be based on evidence sufficient to sustain a conviction." *Blackmon*, 835 A.2d at 1075 (quoting *Rucker v. United States*, 455 A.2d 889, 891 (D.C.1983)). Indeed, "it is clear that only the probability, and not a *prima facie* showing, of criminal activity is the standard of probable cause." *Perkins*, 936 A.2d at 306 (quoting *Illinois v. Gates*, 462 U.S. 213, 235, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). Furthermore, probable cause "does not demand any showing that [the arresting officer's belief in a suspect's guilt] be correct or more likely true than

ment. *See* D.C.Code § 48–904.01(a)(2)(B). The information charging appellant with misdemeanor PWID referred to "a quantity of ... marijuana," which carries a penalty of

not more than 180 days' imprisonment for those with no prior drug convictions. *See* D.C.Code § 48–904.01(a)(2)(B).

**8**

false." *Id.* (quoting *Texas v. Brown*, 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (plurality opinion) (alteration in original)).

At the suppression hearing, the government sought to establish probable cause by presenting evidence of the investigation that led to, and the execution of, Inspector Green's "controlled delivery" to appellant of a parcel containing marijuana. The Supreme Court in *Illinois v. Andreas*, 463 U.S. 765, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983), described the purpose and mechanics of a controlled delivery:

> The lawful discovery by common carriers or customs officers of contraband in transit presents law enforcement authorities with an opportunity to identify and prosecute the person or persons responsible for the movement of the contraband. To accomplish this, the police, rather than simply seizing the contraband and destroying it, make a so-called controlled delivery of the container to its consignee, allowing the container to continue its journey to the destination contemplated by the parties. The person dealing in the contraband can then be

identified upon taking possession of and asserting dominion over the container. *Id.* at 769, 103 S.Ct. 3319 (footnotes omitted).[4]

■ Appellant claims that officers could not arrest him following the successful controlled delivery of the parcel containing marijuana addressed to him because they had no probable cause to believe he knew what was in the package. The question whether acceptance of a controlled delivery by the addressee is sufficient to establish probable cause to arrest the recipient is an issue of first impression for us and one that appears to have received scant attention by other courts. The government relies on *Spencer v. Connecticut*, 560 F.Supp.2d 153 (D.Conn. 2008), which held that the officers had probable cause to arrest an individual once he accepted delivery of a package containing marijuana.[5] *Id.* at 162. That a person accepts or is designated as the addressee of a package containing contraband intercepted by the government is some evidence—but it may not be enough—to establish probable cause that

---

**4.** As is clear from *Andreas*, there is nothing unlawful in a properly executed controlled delivery. The government is not planting drugs or engaging in entrapment; it is merely keeping tight surveillance over the course of an illegal transaction that had already been set in motion by the participants, by lawfully taking custody of the contraband pursuant to a warrant and then completing the delivery to the addressee on the parcel.

**5.** The government also cites two cases involving anticipatory search warrants, *United States v. Whited*, 539 F.3d 693, 697 (7th Cir. 2008) and *United States v. Turner*, 491 F.Supp.2d 556, 560–61 (E.D.Va.2007), to support its claim that a successful controlled delivery establishes probable cause to arrest. Anticipatory search warrants "require the magistrate to determine (1) that it is *now probable* that (2) contraband, evidence of a crime, or a fugitive *will be* on the described premises (3) when the warrant is executed."

*United States v. Grubbs*, 547 U.S. 90, 96, 126 S.Ct. 1494, 164 L.Ed.2d 195 (2006). The Supreme Court held in *Grubbs* that "[a] parcel ... [that is] received by person(s) and [ ] physically taken into the residence" plainly established probable cause sufficient to trigger the anticipatory search warrant of the premises. *Id.* at 94–96, 126 S.Ct. 1494. Neither of the cases relied on by the government is helpful in our analysis, however, as they both involved a controlled delivery that established probable cause to *search for contraband* at the place where the package was delivered, and not to *arrest a person* suspected of criminal behavior. Here, the investigators did not execute the anticipatory search warrant, because by the time they arrested appellant, the parcel with the marijuana was no longer in the premises (the house) specified in the warrant. The house was searched pursuant to the owner's consent.

the *recipient* is engaged in unlawful activity. We recognize there can be a reasonable inference that the *sender* would not entrust contraband that is valuable, with the attendant risk of exposing the sender to criminal liability, to an unknown, unsuspecting person.[6] That inference is not always reasonable, however. For example, in the case of delivery of offensive or noxious materials, such as anthrax, it would not be reasonable to infer that the recipient voluntarily accepts delivery with knowledge of the contents. Similarly, a person who lives with others at a common address may innocently sign for and accept a package intended for a family member, roommate or other tenant, without any knowledge of (or interest in) the contents of the package. Moreover, letters and parcels are often left on front porches, reception areas and slipped through mail slots, or are otherwise routinely delivered and accepted, without knowledge of their contents. Probable cause requires *some* fact suggesting the recipient's awareness that the package contains contraband.[7] We need not decide here whether acceptance of a package in the course of a controlled delivery suffices to establish probable cause in every case[8] because, in this case, the officers had evidence of more than appellant's mere acceptance.

█ In determining whether there is probable cause to arrest in the context of a controlled delivery, we assess the situation as a whole—the usual totality of the circumstances analysis—to establish the recipient's link to the contraband in the controlled delivery. That approach, which we follow, is exemplified by *United States v. Glasser*, 750 F.2d 1197 (3d. Cir.1984). In *Glasser*, the DEA intercepted two packages from Jamaica containing hashish oil hidden inside carved wooden heads. *Id.* at 1199. The officers arranged a controlled delivery in which one of the packages was delivered to Robert Glasser, while the agents conducted surveillance of his home. *Id.* at 1199–1200. About an hour after the package was delivered, another person (Leonard Gaza) drove to Glasser's house, entered it empty-handed, and 5–10 minutes later, left the house carrying a brown bag. The police suspected the objects delivered to Glasser had been taken out of

6. *See Rivas v. United States*, 783 A.2d 125, 136 (D.C.2001) (en banc) (noting that evidence reflected state of mind of person other than defendant).

7. We note there were additional facts in *Spencer* that could have given the officers reason to believe the recipient was not ignorant of the contents of the controlled delivery. The sheriff's office of Shelby County, Tennessee, intercepted a parcel containing twenty-seven pounds of marijuana addressed to a "Sylvia Sloan" at an address in Connecticut. *Id.* at 156. As part of the controlled delivery, an officer disguised as a FedEx courier approached the house, a multifamily residence, and after ringing the door bell was greeted by Spencer. *Id.* Spencer verified the address and told the officer that his name was Michael Spencer and that he lived on the second floor. *Id.* When the officer told him that the delivery was for "Sylvia Sloan," Spencer re-

peated the name to himself, then accepted the package by signing the delivery invoice and entered the house. *Id.* After the officer left, Spencer came back outside, without the parcel, and looked up and down the street. *Id.* At this point, four officers approached the residence, brought Spencer inside, read him his *Miranda* rights, and placed him under arrest. *Id.* The recipient's acceptance of a package he knew was not addressed to him, in the context of his suspicious behavior after the delivery was made, provided additional information from which the arresting officers could have inferred that he knew the package contained marijuana.

8. During oral argument, counsel for the government at times appeared to take this position, but eventually argued that the totality of the circumstances in this case established probable cause to arrest appellant.

the package and placed in the bag Gaza was carrying. *Id.* at 1200. Gaza put the bag in his car and, as he attempted to drive away, was arrested. *Id.* The court held that there were sufficient facts to find probable cause based on the "totality of the circumstances," which included a controlled delivery of known contraband; the officers' knowledge (evidenced by the fact that they had staked out Glasser's house in expectation of an accomplice's arrival) that a common practice of drug smugglers is to have a package delivered to someone other than the ultimate recipient in an effort to avoid detection; Gaza's arrival soon after the delivery empty-handed and prompt departure with a bag; and the size, shape, and appearance of the brown bag, which could have accommodated the imported carved wooden heads used to conceal the contraband. *Id.* at 1206.[9]

We also apply a "totality of the circumstances" analysis and conclude that the facts known to the officers before they arrested appellant, taken as a whole and viewed from the perspective of a reasonable officer with knowledge of the drug trade, established probable cause to arrest appellant. This was a controlled delivery, and the officers obviously knew that the package contained marijuana. The critical question for probable cause, however, is whether the officers reasonably could have

believed that appellant accepted the parcel knowing what was in it. Here, such a belief was reasonable. Appellant accepted a parcel addressed to "Corey Johnson." He did so by signing and printing "Corey Johnson" on the form provided by Inspector Green, disguised as a U.S. Postal Service courier, after twice acknowledging he was "Corey Johnson." Although appellant testified that he made clear he was *not* "Corey Johnson," we defer to the trial court's assessment of the credibility of Inspector Green in this respect, and are bound by its finding that "[Johnson] was not coerced by Inspector Green to sign the receipt." *See Lewis v. United States*, 767 A.2d 219, 222 (D.C.2001) ("Deference must be given to the factfinder's duty to determine credibility . . . .").

The parcel was delivered to a house postal records did not identify as appellant's address, suggesting that the sender knew to find appellant at his girlfriend's house and that appellant had chosen that address to avoid detection. Fifteen minutes after the controlled delivery, appellant left the house with the unopened package,[10] headed towards a car parked in the driveway, and placed the parcel in the car. Investigators knew, based on their experience, that it is common practice for contraband coming from the Midwest or Califor-

---

**9.** In *United States v. Millen*, 338 F.Supp. 747 (E.D.Wis.1972), another case relied on by the government, officers intercepted three mail parcels from Nepal containing hashish addressed to Millen. *Id.* at 749. One of the three parcels was delivered by mail to the address on the parcel, which was the law firm where the defendant worked. *Id.* Millen took custody of the parcel from the firm's receptionist, placed it in his personal lock box in the firm's walk-in safe, and later that day, was seen leaving the office with his coat and briefcase. *Id.* A search of the law firm was subsequently conducted but when the parcel was not found, one of the investigators ordered the officers to arrest Millen. *Id.* Appellant did not dispute that the officers had probable

cause to arrest him, but argued that the officers had time to obtain an arrest warrant. *Id.* at 751.

**10.** The tracking device did not indicate that the parcel had been opened. Different inferences can be drawn from the fact that appellant did not open the package. One is that he did not need to do so because he already knew what it contained. The opposite inference—the one appellant's testimony supported—is that he was returning the parcel to the post office because it was not his and he had accepted its delivery only because Investigator Green forced him to sign the receipt.

nia, to be "transported from the location it's sent to [ ]another location where it is disbursed just in case law enforcement is watching." The officers also knew that the package delivered to appellant was one of at least two parcels containing marijuana sent by Ricardo Austin, who was based in California and involved in suspicious drug-related activity.[11] In light of the officers' knowledge of the sender and characteristics of the drug trade, appellant's acknowledgment that he was the intended recipient, at an address that was not his home, and his exercise of control of the package, we conclude, based on the totality of the circumstances, the officers had probable cause to arrest appellant.

 The search of appellant's car that followed Johnson's arrest and led to the seizure of inculpating evidence was also reasonable as a search incident to appellant's arrest for possession of marijuana. As we noted in *Dawkins v. United States*, 987 A.2d 470 (D.C.2010),

> the warrantless search of an automobile incident to arrest is constitutionally permissible only if the police reasonably believe either that the suspect could have such access to his car as would pose a risk to the safety of the officers or potential destruction of evidence, as permitted by *Chimel* [*v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) ] or that evidence of the offense for which he was arrested could be found in the car, pursuant to *Thornton*

[*v. United States*, 541 U.S. 615, 124 S.Ct. 2127, 158 L.Ed.2d 905 (2004) ].

*Id.* at 476 (citing *Arizona v. Gant*, 556 U.S. 332, 343, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009)). In this case, the search would be reasonable under either *Chimel* or *Thornton*. Appellant had placed the package with the drugs in the car, and opened the door to the driver's seat with an intent to enter the car, thereby possibly posing a risk to the integrity of the drug evidence, the situation addressed in *Chimel*, 395 U.S. at 762–63, 89 S.Ct. 2034. Moreover, *Thornton* allowed the vehicle search because the officers had reason to believe that "evidence relevant to the crime for which he had been arrested might be found in the vehicle," as appellant had just placed the parcel officers knew contained marijuana on the front seat of the car. *See Thornton*, 541 U.S. at 632, 124 S.Ct. 2127. Additional evidence seized during the search was recovered from the vehicle's glove compartment, but that too was reasonable, as a search of a vehicle incident to an arrest may include search of containers "[such as] closed or open glove compartments." *New York v. Belton*, 453 U.S. 454, 460 n. 4, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). Thus, as there was reasonable cause to arrest appellant, and the search of his vehicle incident to that arrest was lawful, under *Gant*, *Chimel*, and *Thornton*, the Fourth Amendment did not require that the fruits of the search be suppressed.[12]

11. Although the exact timing is not altogether clear, it appears that fairly simultaneously with the controlled delivery to appellant, officers in California executed the search warrant at the Englewood address linked to Ricardo Austin. There, they found a postal receipt with the name "Corey" and an address that approximated the one where appellant accepted the controlled delivery. The government did not present this evidence at the hearing on the motion to suppress.

12. The package itself could have been seized as the officers knew it contained contraband. Thus, the only evidence that would have been suppressed had there not been a proper search of the vehicle incident to arrest would have been the documents seized from the glove compartment and front passenger area.

### III. Motion to Suppress Statements

Appellant also claims that a statement he made after he was arrested and confined to the detective's SUV—that the package contained "crushed cookies and medicine"—was procured in violation of the Fifth Amendment.

As a preliminary matter, the government argues that we can review this claim only for plain error because appellant failed to ask for a ruling on his motion to suppress the statement. We do not think we are limited to plain error review in the circumstances presented here. Prior to the first jury trial, appellant filed two motions on the same day (March 4, 2005): the motion to suppress the physical evidence we have just discussed and a motion to suppress the statement. On July 11, 2005, there was a hearing on both motions. At that hearing, the trial judge mentioned the motion to suppress the statement, and asked questions relating to the statement, but the discussion with counsel then focused on the officers' seizure of the package. The hearing concluded with the judge's denial: "Your motion is denied." We have said that "a party who neglects to seek a ruling on his motion fails to preserve the issue for appeal." *Thorne v. United States*, 582 A.2d 964, 965 (D.C. 1990). But in this case, where the judge had expressed his awareness of the pending motion to suppress the statement, it is not clear that the trial court failed to rule, or, instead, denied both motions at the same time. Counsel could have asked the judge to fully explain his ruling on the record.[13] The absence of such an explanation does not hinder our review on appeal, however, because "[w]hether, on the duly established facts, [the appellant] was subjected to custodial interrogation without the benefit of *Miranda* warnings is a ques-

tion of law" we review *de novo*. *Jones v. United States*, 779 A.2d 277, 281 (D.C. 2001) (quoting *Reid v. United States*, 581 A.2d 359, 363 (D.C.1990)). Thus, even if the motions judge did not expressly address appellant's Fifth Amendment claim, we can review the legal issue presented because in this case the relevant facts were "duly established" by the judge who conducted the bench trial. Based on those facts, we conclude there was no Fifth Amendment violation.

At the bench trial, Officer McFadden testified that after appellant was arrested and put in the rear of Detective Zerega's SUV, appellant asked the officers why he was being arrested. McFadden told appellant "he was being arrested for the package," to which appellant responded that "[the parcel] was only crushed cookies and medicine, that [the officers] could test it." Appellant testified that while he was in the SUV, "[he] was questioned as to who resides there, the name of the person, the relationship, where they worked and will [he] be able to make contact with them, [and] so forth." According to appellant, he did not tell the officers anything about the contents of the parcel. The trial judge credited Officer McFadden's testimony over appellant's, based on "[his] demeanor" and the "reasonableness of [his] version." The judge also noted that "reasonable fact finders would reasonably conclude [that] if you didn't know what was in the box, you wouldn't make up something." We defer to the trial judge's factual findings as they are reasonable and not clearly erroneous. *See* D.C.Code § 17–305(a) (2001); *Outlaw v. United States*, 806 A.2d 1192, 1196 (D.C.2002) ("[F]actual findings of the trial court are binding unless they are plainly wrong or clearly erroneous, or without evidence to support them.").

---

**13.** It appears from the record that counsel might have been cowed by the judge, who had

expressed displeasure when counsel did not rise when he addressed the court.

Appellant argues that even if he made the statement, it should have been suppressed because once he was arrested, he was in custody, but was not informed of his *Miranda* rights. We agree that appellant was in custody when the statement was made, but disagree that it was inadmissible because the statement was not elicited through interrogation within the meaning of *Miranda*.

The government is constitutionally precluded by the Fifth Amendment from using in its case-in-chief a defendant's statement, whether exculpatory or inculpatory, stemming from custodial interrogation unless the defendant has been advised of his right to remain silent. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). However, "[i]t is clear ... that the special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation. 'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." *Rhode Island v. Innis*, 446 U.S. 291, 300, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

Custodial interrogation refers "not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301, 100 S.Ct. 1682 (footnote omitted). Not every comment made by a police officer is "reasonably likely to elicit an incriminating response"; "routine questions related to the booking process," for example, are not usually considered "interrogation" under *Miranda*, for such questions are not normally likely to elicit incriminating answers. *Thomas v. United States*, 731 A.2d 415, 424–26 (D.C.1999). Routine booking questions include the "biographical data necessary to complete booking or pretrial services[,]" such as questions regarding the name, address, height, weight, eye color, date of birth, and age of the suspect. *See Pennsylvania v. Muniz*, 496 U.S. 582, 600, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990) (quoting *United States v. Horton*, 873 F.2d 180, 181 n. 2 (1989)).

According to Detective Zerega, after appellant was arrested and placed in the rear of the detective's SUV, he was asked "preliminary information ... [like] his name and address so that [the officers could] complete [their] sheets." This questioning amounted to "routine booking questions," as defined in *Thomas*, 731 A.2d at 421. Officer McFadden, who was seated next to appellant in the back seat, testified that it was appellant who inquired about what he was being arrested for; Officer McFadden answered that it was "for the package." Appellant then stated that it was only "crushed cookies and medicine" and that the officers could "test it." Officer McFadden explained that appellant made this statement "spontaneously," not "in response to any questions." According to the testimony credited by the trial court, appellant's statement was given "freely and voluntarily without any compelling influences" and thus was admissible evidence. *Miranda*, 384 U.S. at 478, 86 S.Ct. 1602. We do not think it plausible that the police should have known that asking routine questions in the rear of a police vehicle onsite immediately after appellant was arrested would likely elicit an incriminating response from him. *See Innis*, 446 U.S. at 301–02, 100 S.Ct. 1682. Therefore, appellant's Fifth Amendment rights were not violated.

## IV. Sufficiency of the Evidence

Appellant's final claim is that the trial court erred in denying his motion for

judgment of acquittal because the government's evidence was insufficient to prove that he possessed and intended to distribute the marijuana in the parcel that was delivered to him.

In reviewing sufficiency claims, the "evidence must be viewed in the light most favorable to the prosecution to determine whether a reasonable factfinder could find guilt beyond a reasonable doubt." *Lewis v. United States*, 767 A.2d 219, 222 (D.C.2001). The evidence must be sufficiently weighty to allow a finding of guilt beyond a reasonable doubt, but it need not compel such a finding, nor must "the government negate every possible inference of innocence." *Timberlake v. United States*, 758 A.2d 978, 980 (D.C.2000). "Reversal of the trial court's denial of appellant's motion for judgment of acquittal is warranted only where there is no evidence upon which a reasonable [trier of fact] could infer guilt beyond a reasonable doubt." *Id.* at 981 (quotations omitted). "In a bench trial, the judge, as fact finder, has the right to make credibility determinations, weigh the evidence, and draw reasonable inferences of fact." *Joiner–Die v. United States*, 899 A.2d 762, 764 (D.C. 2006). In reviewing a bench trial, we will not overturn the trial court's factual findings unless they are "plainly wrong" or "without evidence to support [them]." *Lewis*, 767 A.2d at 222 (alteration in original).

Appellant was charged under D.C.Code § 48–904.01(a)(1) (2001), which states, in relevant part, that "it is unlawful for any person knowingly or intentionally to … possess … with intent to … distribute, a controlled substance." *Id.* Proof of possession requires that the government establish that the accused had actual or constructive possession of the prohibited item. *See Smith v. United States*, 809 A.2d 1216, 1221–22 (D.C.2002). Actual possession is "the ability of a person to knowingly exercise direct physical custody or control over the property in question." *Id.* at 1222 (quoting *United States v. Hubbard*, 429 A.2d 1334, 1338 (D.C.1981)). Proof of possession can be established by either direct or circumstantial evidence. *Smith*, 809 A.2d at 1222.

The government presented sufficient evidence that appellant knowingly possessed the marijuana. Appellant accepted the parcel with the drugs addressed to "Corey Johnson" at the address where he was found, acknowledged he was the correct recipient, and signed the postal receipt, which was introduced at trial. A document found in appellant's car had the name "Corey Johnson" and the address where the package was mailed. Almost immediately after the delivery, appellant left the house carrying the unopened parcel, placed it in the front seat of his car, with the intent to transport it to another location. These actions evidenced actual physical custody and control of the package. And even though appellant never opened the parcel, the fact finder could have inferred from appellant's behavior that he knew what was in it, and thus knowingly possessed the marijuana in the parcel. After being arrested, appellant told the officers that the contents of the parcel were "crushed cookies and medicine," and that the officers could "test it." As the trial court noted in denying the motion for judgment of acquittal, it was reasonable for a factfinder to infer that appellant knew the contents of the parcel because, "if you didn't know what was in the box, you wouldn't make up something." *See United States v. Branham*, 515 F.3d 1268, 1273–74 (D.C.Cir.2008) (rejecting contention that evidence was insufficient because "there was no indication defendant had any idea what was in the package[ ]" where the jury could infer defendant had

1) arranged for the package to be delivered to him at another address, 2) was anticipating its arrival, 3) appeared to try to conceal his connection to the package, and 4) was dealing drugs from the building where the package was delivered); *United States v. Calhoun*, 49 F.3d 231, 236 (6th Cir.1995) (holding evidence sufficient to establish that defendant had knowledge of contraband in parcel even though the parcel was never opened, because she, *inter alia*, signed a false name for a package that contained a kilogram of cocaine and gave officers false information about the person she claimed was the intended recipient). Furthermore, as discussed *infra*, there was evidence linking appellant to a large-scale contraband operation, which bolsters the conclusion that appellant possessed the parcel with knowledge that it contained marijuana. *See Branham*, 515 F.3d at 1274; *cf. Moore v. United States*, 927 A.2d 1040, 1050 (D.C.2007) ("[W]e have recognized that a *prima facie* case of constructive possession may be established by evidence linking the accused to 'an ongoing criminal operation of which that possession is a part.'" (quoting *Earle v. United States*, 612 A.2d 1258, 1265–66 (D.C.1992)).

The evidence also sufficed to prove that appellant possessed the marijuana with the intent to distribute. We have held that such an intent can be inferred from the possession of a quantity of drugs that exceeds supply for personal use. *See Taylor v. United States*, 662 A.2d 1368, 1371 (D.C. 1995); *Shorter v. United States*, 506 A.2d 1133, 1135 (D.C.1986). The government presented unrebutted expert testimony that the quantity of the drugs recovered from appellant was consistent with an intent to distribute. The parcel contained approximately 4,797 grams of marijuana worth between $10,000 and $47,000. The trial court credited the expert witness who testified that, given the packaging of this "very large" crushed quantity of marijua-na, appellant clearly intended to distribute the drugs on the streets of the District of Columbia. We have upheld PWID convictions for possession of contraband worth far less than the marijuana appellant possessed. *See, e.g., Spriggs v. United States*, 618 A.2d 701, 704 (D.C.1992) (eight packets of heroin and five packets of cocaine worth approximately $470); *Taylor*, 662 A.2d at 1370 (crack cocaine worth $180); *Mack v. United States*, 570 A.2d 777, 779 (D.C. 1990) (a gallon jar of PCP and one pound of marijuana worth an estimated $4,500).

In addition to the quantity of drugs, there were other indications that the marijuana was intended for distribution. According to the government's narcotics expert, the parcel and the way the drugs were packaged were typical of "how marijuana is sent through the Washington metropolitan area in bulk form" for further distribution. Once the package is received, it is transported to another location where it is further distributed, to reduce the likelihood of raising law enforcement awareness. The expert testified that the buyers tend to use fictitious names and addresses that do not correspond with their residence or work addresses. The narcotics expert also testified that dealers often obtain supplies from the Midwest or California and pay for shipments by wiring money through Western Union or by mailing multiple money orders in $1,000 increments. He explained that money orders are the most common methods of payment because they leave almost no paper trail.

The known scheme described by the expert closely resembles the operation of the transaction involving appellant. The two packages of marijuana located in the parcel Johnson accepted were wrapped in Saran Wrap and dryer sheets, in an apparent attempt to mask the odor of the drugs during delivery from the West to the East coast. The package was addressed to a

fictitious name and delivered to appellant's girlfriend's house. Minutes after its delivery, appellant left the house with the parcel and placed it in his car, with the intention to take it to some other location. Finally, the government presented evidence that tied appellant to Ricardo Austin, who was connected to drug-trade activity: the parcel containing 16 pounds of marijuana addressed to appellant was sent by Austin from California; at least four money orders totaling $3,500 were purchased by "Courthney Johnson" and sent to Ricardo Austin in California; an express-mail receipt located in a postal office in Baltimore identified "Courthney Johnson" as its sender and an individual in California as the recipient; three different addresses, all within the greater D.C. area, were connected to a drug scheme and to a "Corey," "Courthney" or "Courtney" Johnson; several other parcels containing marijuana found at the Barlow Place address, all of which used fictitious names, and similar packaging and the same handwriting as the package accepted by appellant, were connected to Ricardo Austin. These facts, taken as a whole, constitute ample evidence from which a reasonable fact finder could find, beyond a reasonable doubt, that appellant knowingly possessed the marijuana that was the subject of the controlled delivery with the intent to distribute it.

*Affirmed.*