*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA OF APPEALS**

No. 21-CF-0120

SYLVESTER C. TOYER, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2019-CF2-009471)

(Hon. Erik Christian, Trial Judge)

(Submitted December 14, 2021                    Decided October 31, 2024)

*Michael Bruckheim*, for appellant.

*Chimnomnso N. Kalu*, Assistant United States Attorney, with whom *Channing D. Phillips*, Acting United States Attorney, *Chrisellen R. Kolb, John P. Mannarino, Adam Braskich,* and *Andy Wang*, Assistant United States Attorneys, were on the brief, for appellee.

Before BECKWITH and EASTERLY, *Associate Judges*, and THOMPSON, *Senior Judge*.[*]

---

[*]Judge Thompson was an Associate Judge of the court at the time of submission. On February 18, 2022, she began her service as a Senior Judge.

BECKWITH, *Associate Judge*:  Officers arrested Sylvester Toyer after running his name through the Washington Area Law Enforcement System (WALES) and discovering a warrant for his arrest.  While searching him incident to arrest, officers uncovered $1,500 in cash along with fourteen separate baggies containing crack cocaine.  This appeal arises from Mr. Toyer's subsequent trial and conviction for possession with intent to distribute cocaine.  Mr. Toyer challenges the trial court's denial of his motion to suppress the cash and cocaine, the trial court's admission of his bank records, and the sufficiency of evidence.  We conclude (1) that the initial search of Mr. Toyer's name in the WALES system was not unlawful, (2) that the trial court did not err in admitting bank records showing Mr. Toyer's monthly income, and (3) that the evidence was sufficient to show beyond a reasonable doubt an intent to distribute.  We therefore affirm Mr. Toyer's conviction.

**I.**

Around 7 p.m. on July 16, 2019, Metropolitan Police Department Officers Qieth McQureerir and Johann Ruano spotted Sylvester Toyer standing at a bus stop.  According to his testimony at a subsequent suppression hearing, Officer McQureerir "immediately recognized" Sylvester Toyer because he knew him from "previous encounters."

After spotting and recognizing Mr. Toyer, the officers performed a Washington Area Law Enforcement System (WALES) check, which revealed an open warrant for Mr. Toyer's arrest. They then approached Mr. Toyer, arrested him, and searched him incident to that arrest. During the search, the officers recovered from Mr. Toyer's pockets more than $1,500 in cash along with fourteen Ziploc bags containing a "white rock-like substance" later tested and found to be cocaine.

Prior to trial, the parties raised two evidentiary matters that are now relevant to this appeal. First, Mr. Toyer moved to suppress the drugs and the cash, arguing that the database search that preceded his arrest and search was unlawful because the officers did not see Mr. Toyer doing anything suspicious or illegal before they ran his name through WALES. The trial court denied that motion.

Second, the parties sought a stipulation as to the admission of bank records from an account into which Mr. Toyer deposited his monthly social security checks. Mr. Toyer's counsel sought to introduce records only from April to July 2019—the month in which the offense occurred—while the government sought to introduce records for the entire history of the account going back to December 2018. The trial court ruled in favor of the government, concluding that it could introduce records going back to December 2018, in part because the range was not particularly long.

A three-day jury trial followed. Officer McQureerir testified to the circumstances of Mr. Toyer's arrest, consistent with his testimony from the suppression hearing. The government also presented the testimony of Detective George Thomas, an expert on the distribution, packaging, and pricing of narcotics for street-level distribution in the District of Columbia. According to Detective Thomas, "it would be very likely that someone" carrying the amount of cash and drugs that Mr. Toyer had with him "was, in fact, possessing with intent to distribute."

During cross examination, defense counsel read the parties' stipulation about Mr. Toyer's bank records into the record and asked Detective Thomas if—given that Mr. Toyer deposits "at least $948" into his bank account each month and then "immediately withdraws the cash a day or two later"—there could be "other reasons" to have the drugs and money that are not "indicative of [possession] with intent to distribute." Detective Thomas agreed that there "could be other reasons" and that "it's not always the case that if someone has a large amount of money on them and drugs that they're out there distributing" those drugs.

Mr. Toyer presented his own expert witness, Myron Smith, who had spent eleven years within the Narcotics and Special Investigations Division of MPD. Mr. Smith testified that the amount of cocaine recovered from Mr. Toyer—which he estimated to be 3.5 grams—was "well within the realm of personal use," and the

amount of cash found on Mr. Toyer and the absence of paraphernalia did not change his view. On cross-examination, Mr. Smith acknowledged that he had testified in 1996 that it is "uncommon" for an individual to possess ten Ziploc bags of cocaine for personal use.

The jury found Mr. Toyer guilty of one count of possession with intent to distribute a controlled substance (PWID).

## II.

### A. Motion to Suppress

Mr. Toyer first challenges the trial court's denial of his motion to suppress the drugs and cash found on him during the officers' search incident to arrest. "When reviewing a trial court's denial of a motion to suppress evidence, we defer to the court's factual findings unless they are clearly erroneous, but we review the court's legal conclusions de novo." *Green v. United States*, 231 A.3d 398, 405 (D.C. 2020).

Here, Mr. Toyer argues that the act of searching his name in the WALES database constituted an illegal search because the police "did not have probable cause to believe, or a reasonable articulable suspicion, that Mr. Toyer was committing, or had committed, a crime prior to checking his name and discovering

the outstanding warrant." To the extent Mr. Toyer is arguing that Officer McQureerir needed reasonable suspicion or probable cause to run the WALES check, he identifies no relevant authority and we are not inclined to adopt such a rule on this record.[1] As detailed above, Officer McQureerir recognized Mr. Toyer, ran his name through WALES, and learned of the open arrest warrant before stopping Mr. Toyer. Mr. Toyer does not argue that he was seized before police discovered the warrant's existence, *see Gordon v. United States*, 120 A.3d 73, 84–85 (D.C. 2015), or that the warrant was invalid, *see Gilchrist v. United States*, 300 A.2d 453, 455 (D.C. 1973). Accordingly, police could check his name in WALES, and once they discovered that there was an active warrant for his arrest, this warrant provided

---

[1] Though we conclude that a WALES check is not a search requiring reasonable suspicion or probable cause—as standing alone, a WALES check does not infringe upon "any personal rights of this appellant," *Taylor v. United States*, 296 F.2d 446, 448 (D.C. Cir. 1961) (holding that law enforcement officers' search of files and records of the House of Representatives did not violate the Fourth Amendment for this reason); *see also Rose v. United States*, 629 A.2d 526, 530 (D.C. 1993) ("Standing to object to a search or seizure as a violation of constitutional rights depends on whether the person claiming the protection of the Fourth Amendment has a legitimate expectation of privacy in the invaded place.") (internal quotation marks and citations omitted)—the Fourth Amendment may, for other reasons, still bar officers from conducting a WALES check. *See, e.g.*, *Ramsey v. United States*, 73 A.3d 138, 148-49 (D.C. 2013) ("[T]he detention of appellant for a WALES check, although brief in duration, was a seizure, for which [the officer] lacked reasonable articulable suspicion or probable cause, and which therefore violated appellant's rights under the Fourth Amendment.").

the police with probable cause to arrest Mr. Toyer and search him incident to that arrest.  We affirm the trial court's denial of Mr. Toyer's motion to suppress.

## B. Bank Records

Mr. Toyer next challenges the trial court's decision to admit bank records demonstrating that he deposited $948 in social security income each month and that he regularly withdrew those deposits a few days later.

"The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice."  Fed. R. Evid. 403; *see also Johnson v. United States*, 683 A.2d 1087, 1099 (D.C. 1996) (en banc) (announcing that this court "will follow FRE 403").  "The evaluation and weighing of evidence for relevance and potential prejudice is quintessentially a discretionary function of the trial court, and we owe a great deal of deference to its decision." *Romero v. United States*, 266 A.3d 217, 225 (D.C. 2022).  "[W]e will not disturb its

ruling absent an abuse of discretion."[2] *Sanders v. United States*, 809 A.2d 584, 590 (D.C. 2002) (quoting *Smith v. United States*, 665 A.2d 962, 967 (D.C. 1995)).

Mr. Toyer argues that the bank records are not relevant because the "transactions did not necessarily connect to the charges the Government brought against Mr. Toyer. Just because someone has a bank account that they barely use does not mean that the account is connected to alleged criminal activity." But Mr. Toyer's argument assumes a more exacting relevance test than the standard demands. *Wilson v. United States*, 266 A.3d 228, 243 (D.C. 2022) ("The test for relevance is not a particularly stringent one.") (quoting *Street v. United States*, 602 A.2d 141, 143 (D.C. 1992)). When determining whether evidence is relevant, we ask simply whether it "tends to make the existence or nonexistence of a fact more or less probable than would be the case without that evidence." *Id.* (quoting *In re L.C.*, 92 A.3d 290, 297 (D.C. 2014)). Here, the records were relevant because they helped the jury decide whether it was more likely that Mr. Toyer had obtained the $1,500

---

[2] The government argues that because Mr. Toyer introduced the bank records evidence himself during trial, any error in admitting the evidence was invited and is therefore not reviewable on appeal. It further argues that even if Mr. Toyer did not invite the error, we should review the admission of the evidence for plain error because at trial Mr. Toyer opposed only the admission of pre-April bank records and agreed to the admission of records from April to July. We need not decide whether any error was invited or plain because even under the less demanding abuse-of-discretion standard Mr. Toyer's claim fails.

through lawful means—such as his social security income—or by selling crack cocaine.

Mr. Toyer urges us to view his case like *Williams v. United States*, where the Supreme Court held that bank record evidence was irrelevant where the government used it "to cause the jury to believe that the accused had in his possession more money than a man in his condition could have obtained by honest methods, and therefore he must be guilty of extorting the two sums in question." 168 U.S. 382, 396 (1897). But *Williams* is different in at least one respect. In *Williams* the government introduced the bank records. *Id.* at 391-92. But here, Mr. Toyer stipulated to the records at trial and used them to argue that one could reasonably believe that Mr. Toyer was saving the money and "us[ing] a portion of it to buy $240 worth of drugs for his personal use." Although Mr. Toyer challenged the number of bank records the trial court admitted, his stipulation to the admission of a portion of these records and reliance upon them at trial tends to indicate the trial court did not abuse its discretion in finding the evidence relevant. [3]

---

[3] It is also worth noting that *Williams* was published nearly seventy-five years before the Federal Rules of Evidence went into effect, when the entire aim of the law of evidence "was to control what the jury could and could not hear. . . . Evidence

Whatever the bank records' probative value, Mr. Toyer has not shown that it was substantially outweighed by any unfair prejudice. While Mr. Toyer may be correct that the records "made the jury believe that Mr. Toyer possessed more money than he could have acquired honestly and he had to be guilty of the accused conduct," that does not make the evidence *unfairly* prejudicial. Unfair prejudice "means 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *Romero*, 266 A.3d at 225 n.17 (quoting Fed. R. Evid. 403 advisory committee's note to 1972 proposed rules). For example, we have held that testimony about a defendant's "personal anguish" at learning that his grandfather had raped his mother was properly excluded because it risked "appeal[ing] unfairly to the jury's sympathies." *Johnson v. United States*, 960 A.2d 281, 297, 300 (D.C. 2008); *see Mercer v. United States*, 724 A.2d 1176, 1186 (D.C.

---

had to be censored, filtered, bowdlerized, before it reached the tender ears of the jury. Everything even remotely prejudicial or irrelevant had to be kept out of the courtroom." Lawrence M. Friedman, *A History of American Law* 382 (4th ed. 2019). This view of relevance changed with the creation of the Federal Rules of Evidence, which direct courts to view the relevance of evidence broadly, cautioning that a "stringent requirement is unworkable and unrealistic." Fed. R. Evid. 401 advisory committee's note to 1972 proposed rules. Courts following the Federal Rules of Evidence have generally deemed bank records like those at issue here to be relevant. *See e.g.*, *United States v. Collins*, 764 F.2d 647, 653-54 (9th Cir. 1985) (holding that introduction of bank records into evidence was not more prejudicial than probative because "large amounts of unexplained cash have been held to be 'more than only slightly' probative of intent and state of mind to enter upon a narcotics distribution scheme." (quoting *United States v. Bernal*, 719 F.2d 1475, 1478 (9th Cir. 1983))).

1999) (determining that the witness's statement that she was unhappy to testify because she "could leave here today and y'all might never see me again" was unfairly prejudicial because it implied that she had been threatened, which "could very well have aroused the passions of the jury, and suggested a conviction based on their aversion.").

When deciding whether evidence is unfairly prejudicial, therefore, we consider factors such as whether the evidence is "inflammatory" or "calculated to appeal to the jury's emotions." *See Ruffin v. United States*, 219 A.3d 997, 1011 (D.C. 2019) (concluding that trial court did not abuse its discretion in admitting a knife into evidence in part because "[t]he knife was not inflammatory evidence calculated to appeal to the jury's emotions and prejudice the jury against appellant"); *see*, *e.g.*, *Wilson*, 266 A.3d at 243 (concluding that the introduction of a text message from a coconspirator to the victim in which the coconspirator called herself a "gangsta" was not unfairly prejudicial because it merely showed the coconspirator's animosity towards the victim); *Lewis v. United States*, 263 A.3d 1049, 1065 (D.C. 2021) (ruling that the expert's testimony was not unfairly prejudicial, even where the jury was aware that the expert "had participated in the investigation of this case as an ATF agent and was privy to much information not disclosed to the jury"). To be sure, inflammatory or emotional evidence is not the *only* evidence that can be

unfairly prejudicial. *See Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 387 (2008) ("Relevance and prejudice under Rules 401 and 403 are determined in the context of the facts and arguments in a particular case, and thus are generally not amenable to broad *per se* rules."). But here, Mr. Toyer fails to show how the evidence—while possibly prejudicial—was at all unfair to him.

### III. Sufficiency

Finally, Mr. Toyer argues that the evidence was insufficient to prove beyond a reasonable doubt that he had the requisite intent to distribute cocaine. When reviewing claims of insufficient evidence, we must decide "whether, after viewing the evidence in the light most favorable to the government, drawing all reasonable inferences in the government's favor, and giving deference to the jury's right to determine credibility and weight, there was sufficient evidence from which a reasonable mind might fairly infer guilt beyond a reasonable doubt." *Rollerson v. United States*, 127 A.3d 1220, 1232 (D.C. 2015) (quoting *Blakeney v. United States*, 653 A.2d 365, 369 n.3 (D.C. 1995)). The government's evidence "need not 'compel a finding of guilt' or negate 'every possible inference of innocence.'" *Id.* (quoting *Timberlake v. United States*, 758 A.2d 978, 980 (D.C. 2000)). Instead, it is the appellant who "bears the heavy burden of showing that the prosecution offered no evidence upon which a reasonable mind could find guilt beyond a reasonable doubt."

*Bruce v. United States*, 305 A.3d 381, 392 (D.C. 2023) (quoting *Dorsey v. United States*, 154 A.3d 106, 112 (D.C. 2017)).

To prove PWID cocaine, the government must establish that Mr. Toyer "knowingly and intentionally possessed [cocaine] with the specific intent to distribute it." *Digsby v. United States*, 981 A.2d 598, 604 (D.C. 2009) (quoting *Taylor v. United States*, 662 A.2d 1368, 1371 (D.C. 1995)). "An intent to distribute can be inferred from the possession of a quantity of drugs that 'exceeds supply for personal use' or that is packaged in a manner indicative of future distribution." *McRae v. United States*, 148 A.3d 269, 273 (D.C. 2016) (quoting *Johnson v. United States*, 40 A.3d 1, 15 (D.C. 2012)).

Here, the government introduced sufficient evidence upon which a reasonable mind could find beyond a reasonable doubt that Mr. Toyer intended to distribute cocaine. Detective Thomas, testifying for the government, estimated that the crack cocaine recovered from Mr. Toyer weighed more than 4.3 grams and had a resale price of at least $600—an amount greater than the quantity typically purchased at one time for personal use. He testified that he had "not seen a user go out and purchase this much [cocaine] at one time for personal use" and that cocaine users tend to buy no more than three bags at a time because there are "quality control issues associated with drugs being sold on the streets." Seeking to buy ten or twenty

"zips" "sets off red flags for the actual dealer" and raises concerns that the buyer is working with the police and setting them up. He also testified that crack users typically carry a crack pipe and that he "would expect anyone that's claiming they are going to use to definitely have a crack pipe on them." And although Mr. Toyer's expert testified that the items recovered from Mr. Toyer were "well within the realm of personal use," the jury was not required to credit that testimony, and indeed his opinion was undermined by his testimony in a previous case that "[o]ftentimes, a user would not have ten separate ziplocs for their own personal use."

Mr. Toyer argues that there is an alternative way to read the evidence: the jury could have found him to be a drug user rather than a drug dealer. But our job is to view the evidence in the light most favorable to the government, and here, when viewed in that light, we are satisfied that the government's evidence about the amount of cocaine, how it was packaged, the amount of money, and the lack of any drug paraphernalia that could be used to smoke the crack cocaine was enough for a jury to reasonably conclude beyond a reasonable doubt that Mr. Toyer intended to distribute the fourteen baggies of cocaine recovered during the police search. *See Spriggs v. United States*, 618 A.2d 701, 704 (D.C. 1992) (affirming a PWID conviction where the "quantity, packaging, and value of the drugs" possessed by the defendant—thirteen separate packets worth approximately $470—was "more

consistent with an intent to distribute than with personal use"); *Taylor*, 662 A.2d at 1372 (affirming a PWID conviction based on the absence of drug paraphernalia, the appellant's negative drug test, and expert testimony that the large quantity of cocaine was consistent with distribution rather than personal use).

## IV.

For the foregoing reasons, we affirm the judgment of the Superior Court.

*So ordered.*