John E. SETTLES, Jr., Appellant,

v.

UNITED STATES, Appellee.

No. 89–CF–1211.

District of Columbia Court of Appeals.

Argued March 25, 1992.

Decided Sept. 29, 1992.

Sandra K. Levick, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant.

J. Patrick Rowan, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John R. Fisher, Roy W. McLeese, III and Debra L. Long–Doyle, Asst. U.S. Attys., were on the brief, for appellee.

Before FERREN, STEADMAN and WAGNER, Associate Judges.

STEADMAN, Associate Judge:

Appellant, John E. Settles, appeals from his conviction of second-degree murder while armed for the shooting of his twelve-year-old nephew.[1] On appeal, appellant challenges three rulings of the trial court: (1) the trial court's admission of evidence that appellant was "high" from ingesting drugs in the hours preceding the murder; (2) the trial court's denial of his motion to suppress the murder weapon; and (3) the trial court's denial of a motion for mistrial based on the prosecutor's allegedly improper appeal to the passions and prejudices of the jury in her opening statement and closing argument.[2] We conclude that even if the admission of testimony about appellant's drug use was error, the error was harmless in light of the special circumstances of this case, most notably the appellant's own, properly admitted statements, also in evidence, about his drug use at the time of the murder. Second, we perceive no error in the trial court's denial of the motion to suppress the murder weapon in light of the trial court's factual findings and this court's decision in *Clark v. United States*, 593 A.2d 186 (D.C.1991). Finally, we conclude that the prosecutor's comments do not constitute a basis for reversing appellant's convictions. Accordingly, we affirm.

## I

At the time of the murder, appellant resided at 236 37th Place, Southeast, with his sister, Eleanor Settles, and her four children, one of whom was the decedent, Mark Settles. Shortly after 2:45 p.m. on December 17, 1987, one of the Settles's neighbors, Pamela Lucas, heard four gunshots coming from the direction of the Settleses's home as she passed the home after picking up her son from school.[3] Thirty to forty-five minutes later, Eleanor Settles returned to her home and found the bodies of her son and the family dog on the floor of the house. Appellant, who apparently was unconscious, also lay prone on the floor, but at some point he regained consciousness and began to shout that his nephew had been shot. Police soon arrived on the scene, and appellant was taken to D.C. General Hospital for treatment of a bullet wound to his left leg, near his kneecap. The police also cordoned off the house, keeping the growing crowd of bystanders, which by now included many family members, from entering the house until the bodies of Mark Settles and the dog had been removed. Sometime within one-half hour of their arrival, the police on the scene received a telephone call from the homicide office of the Metropolitan Police Department informing them that Bernard Williams, who had been one of the first to arrive on the scene and who had been transported to the homicide office to give a statement, had spotted a gun near the body of the dog. Based on this tip, the police located the gun in plain view along the wallboard and protruding from under the back of the dog. A subsequent examination of the gun revealed that it contained four shell casings, one live round, and one empty chamber.

Although the detectives investigating the murder initially regarded appellant as a victim, appellant's conflicting accounts of the incident soon led them to regard him as a suspect. In his second statement to the police,[4] given the day after the shooting, appellant stated that he and Mark had been alone in the house shortly before the shooting when they heard a knock at the door. Moments after Mark answered the door, appellant heard two gunshots, and a gun had appeared around the corner and fired, wounding him in the leg. Appellant denied

---

1. D.C.Code §§ 22–2403, –3202 (1989). He also appeals from the related conviction of cruelty to animals for the shooting of the family dog. D.C.Code § 22–801 (1989).

2. Appellant also contends that other remarks and actions of the prosecutor infected the entire trial. To the extent that this is a distinct claim, it is one without merit.

3. Another neighbor heard the gunshots as well, but neither one investigated further or called the police.

4. The trial court suppressed appellant's first statement, made to the police while he was being treated at the hospital, on voluntariness grounds.

that he had a weapon, but he admitted to firing a gun at someone named Bruce [5] the day before the murder, and he identified the gun the police found in his house as the gun he had fired. When asked if he had shot Mark, appellant replied "not to my knowledge." Finally, appellant acknowledged that he had smoked one joint of marijuana laced with cocaine shortly before the murder, and that he may have consumed a beer as well.

Appellant was arrested in connection with the shootings on January 5, 1988, and he confessed to the crimes in an audiotaped statement made shortly thereafter. In his confession, appellant stated that he had precipitated an argument with his nephew by telling him not to associate with neighborhood drug dealers, and that at some point the two began to struggle over appellant's gun. According to appellant, "[Mark] shot my leg first and I didn't mean to shoot him in the head but ... I tried to shoot him in the shoulder you know just to wound him 'cause, [as I] say, I was kinda nervous and kinda mellow high ... it wasn't no delirious high.... The dog was right there and he was like a little upset, he was ready to bite me, you know. So I had to shoot the dog too." (Final ellipsis supplied). Later in his confession, appellant elaborated on the circumstances surrounding his shooting of his nephew, stating that Mark had reached for the gun first, appellant had grabbed the barrel, and that Mark had shot appellant in the leg in the ensuing struggle. Mark then ran for the back door, saying "No, John, no ... as if he ain't mean[t] to shoot me," and appellant shot him as he was trying to cut around the corner. Appellant also described the quantity of the drugs he had consumed the day of the murder, and the effect of the drugs on him at the time he shot his nephew. According to appellant, he had had "a little bit of cocaine," which had led him to "driv[e] a little shaky" and had produced the "kinda mellow high."

Appellant's audio-taped confession was admitted into evidence and played for the jury. In addition, the government introduced other evidence that corroborated details of the confession. Specifically, a government expert testified that the bullets in the bodies of Mark Settles and the dog were fired from the gun that appellant had admitted was his. Expert testimony also was admitted to show that the bullets were fired from behind Mark Settles and the dog, a fact that corroborated appellant's statement that he shot his nephew while he was running away and that was consistent with expert testimony that dogs normally run away from loud noises such as gunshots. The government also introduced evidence that appellant's wound was consistent with either a struggle over the gun or with self-infliction. Finally, and over vehement defense objection, the government elicited testimony regarding appellant's drug use the day of the murder and the effect of the drugs on appellant's behavior.

## II

Appellant's primary contention on appeal is that the trial court erred in admitting the testimony of appellant's drug use on the day of the murder under the motive exception of *Drew v. United States*, 118 U.S.App.D.C. 11, 331 F.2d 85 (1964). The trial court concluded that the evidence fell under the motive exception "in the sense of explanation for the cause of [appellant's] conduct" and concluded that its probative value outweighed its potential for prejudice. However, we need not determine whether the admission of the challenged evidence comported with our jurisprudence in this area. Rather, we conclude that, under the particular circumstances of this case, any error in admitting the evidence was harmless under the standard of *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). Appellant confessed to the crime, and in doing so described his drug use and his mental state at the time of the murder. As explained below, the witnesses's testimony and appellant's properly admitted statements about

---

**5.** Appellant was referring to Bruce Newsome. At trial, appellant claimed that Newsome had

shot appellant, his nephew and the dog.

his drug use were substantially similar, and to the extent that the testimony was richer in detail, those details were not exploited—indeed, they were hardly mentioned—by the government.

In this regard, we make note at the outset that this case is very different from *Coates v. United States*, 558 A.2d 1148 (D.C.1989) and *Durant v. United States*, 551 A.2d 1318 (D.C.1988), relied on by appellant, both of which involved the admissibility of evidence of use of PCP for purposes of impeachment. In *Coates*, we affirmed the trial court's decision to exclude expert testimony that would have built on previously-admitted evidence of the victim's PCP use by discussing the effects of PCP use on memory even though the expert had not spoken with the victim about her drug use and hence had "proffered no testimony about her personal reaction to PCP." 558 A.2d at 1154. The proffered testimony in *Coates* would not have been duplicative of other evidence before the jury, and we found that the trial court had acted within its discretion in concluding that the expert witness's qualifications for making the proposed assertions had not been sufficiently established. *Id.* Similarly, admissibility of the evidence at issue in *Durant*—medical records of a urine sample showing the defendant's use of PCP offered to impeach his memory and perception of events occurring the day before the sample was taken—turned on the fact that the challenged evidence, which was the only evidence that related to the defendant's perception and memory, lacked a proper foundation for its admissibility. 551 A.2d at 1326–28. In the instant case, by contrast, the challenged testimony significantly overlapped appellant's own statements about his drug use.

We turn to the challenged testimony. Three witnesses testified at trial about appellant's drug use on the day of the offense. Calvin Sims, a friend of appellant's, testified that, at some undetermined time after 11:30 a.m. on the day of the murder, he, appellant, and two others named Bobby and Duke shared two joints of PCP laced

with cocaine.[6] According to Sims, appellant did not act as though he was high at this point. Sims, appellant, Bobby and a fourth person later shared another two joints of PCP laced with cocaine. Sims was unable to recall how much of any of the four joints appellant had smoked, but he testified that appellant was acting "confused" and was driving slowly with his headlights on, beeping the car horn to the beat of go-go music. Sims concluded his testimony by stating, in somewhat contradictory fashion, that during the drive appellant seemed high to him, but that he "couldn't tell if he was high or how high or whatever." Wanda Crawford testified that she saw appellant, Sims, Bobby, and "Wire Bond" sitting in appellant's car, which was parked outside appellant's house, at approximately 2:00 p.m., and that she could tell that the four of them were smoking "boat"[7] by the odor emanating from the car. Crawford further testified that when appellant got out of the car, she was able to tell that he was high from "the way he was walking" and from "his eyes." Finally, Alan Forrest, appellant's nephew and the decedent's first cousin, testified that he drove with appellant in his car at approximately 12:00 or 12:30 p.m., and that appellant was not acting himself, was driving the car fast, and seemed high.

Appellant's statements, including three in which he described his drug usage on the day of the offense, were introduced later in the government's case-in-chief. In his December 18, 1987 statement, appellant stated that he had smoked "one joint of marijuana with cocaine on it" while with Calvin Sims at about 2:00 p.m. or 2:30 p.m. In response to the question of whether he had been drinking that day, appellant stated that he had had "[at most] one beer." In his December 31, 1987 statement, appellant reiterated that he had smoked marijuana laced with cocaine on the day of the murder. Appellant provided additional details of his drug use on the day in question in his January 5, 1988 confession. In his confession, appellant related that in the

---

**6.** Sims testified that the cocaine was in rock form, indicating that it was crack cocaine.

**7.** "Boat" or "Loveboat" is slang for PCP.

early afternoon he had driven Bobby Wilkes to his house and, once there, had "had a little bit of cocaine." According to appellant, at this point "me and Calvin drove back home together, and I was driving a little shaky but I made it to my house." Finally, appellant described how he felt at the time of his and Mark's struggle over the gun, stating "I tried to shoot him in the shoulder, you know just to wound him 'cause, as I say, I was kinda nervous and kinda mellow high ... it wasn't no delirious high."[8]

Having assumed that admission of the challenged testimony of the three witnesses was error, we turn directly to considering whether the alleged error was harmless. In so doing, we take account of the traditional factors of the closeness of the case, the centrality of the issue affected by the error, and any steps taken to mitigate the effects of the error. *See Brooks v. United States*, 599 A.2d 1094, 1102 (D.C. 1991); *Clark v. United States*, 593 A.2d 186, 193 (D.C.1991); *Gaither v. United States*, 134 U.S.App.D.C. 154, 172, 413 F.2d 1061, 1079 (1969). As always, our focus is on the likely impact of the alleged error on the jury's verdict. *Kotteakos, supra*, 328 U.S. at 765, 66 S.Ct. at 1248 (question is whether error "substantially swayed" the jury's verdict); *see also* 3 WAYNE R. LA-FAVE AND JEROLD H. ISRAEL, CRIMINAL PROCEDURE § 26.6(b) (1984). Relevant to a determination of whether error (assumed or actual) in admitting certain evidence is harmless is the degree to which the evidence is cumulative of other, properly admitted evidence. *See Derrington v. United States*, 488 A.2d 1314, 1331–33 (D.C.1985), *cert. denied*, 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 201 (1988); LAFAVE, *supra*, § 26.-6(b), at 267–68. Consequently, we begin by considering whether appellant's own statements about his drug use on the day of the murder were properly admitted.

As a general matter, references to uncharged crimes in a confession are subject to the same types of restrictions on admissibility as would apply if the uncharged

crimes evidence came from another source. *See United States v. Wiggins*, 166 U.S.App.D.C. 121, 129, 509 F.2d 454, 462 (1975); *Robinson v. United States*, 61 U.S.App.D.C. 370, 63 F.2d 147 (1933). Thus, "[w]hile it is the general rule that a confession to be admissible must relate to the offense charged, it is equally true that it may include other offenses when there can be no separation of the relevant and irrelevant parts or when 'the two crimes are so connected as to be part of a general scheme.'" *Robinson, supra*, 61 U.S.App. D.C. at 371, 63 F.2d at 148 (quoting *Borum v. United States*, 61 U.S.App.D.C. 4, 6, 56 F.2d 301, 303 (1932)) (citations omitted); *see also* EDWARD J. IMWINKELRIED, UNCHARGED MISCONDUCT EVIDENCE § 6.19, at 31–32 (1984); 22 CHARLES A. WRIGHT & KENNETH W. MILLER, JR., EVIDENCE § 5248, at 522 & n. 19 (1978). In this regard, the rationale for admitting evidence of other criminal activity that is " 'intimately entangled with the charged criminal conduct,'" *Parker v. United States*, 586 A.2d 720, 724 (D.C. 1991) (quoting *Toliver v. United States*, 468 A.2d 958, 960 (D.C.1983)), without any substantive limitations on its use appears at least as applicable where the evidence consists of the defendant's own explanation of the circumstances surrounding the charged offense as where the evidence comes from another source.

Appellant's explanation that he tried to shoot his nephew in the shoulder just to wound him " 'cause, as I say, I was kinda nervous and kinda mellow high ... it wasn't no delirious high" is the type of contemporaneous evidence of the circumstances surrounding the charged offense that is properly introduced without the *Drew* safeguards as what might be referred to as "pure" *Toliver* evidence. *See, e.g., Johnson v. United States*, 596 A.2d 980, 986 & n. 13 (D.C.1991). Nor can we perceive any basis for redacting appellant's immediately preceding statements that he "had a little bit of cocaine" and that he was "driving a little shaky." This description

---

**8.** Appellant also testified during direct examination at trial that he and Sims got high on the day of the murder.

of appellant's actions and the physical effects of the drugs was indispensable to the jury's understanding of appellant's description of his mental and physical state at the time of the shooting as one of being "kinda nervous and kinda mellow high." Appellant's other descriptions of his drug use, although less closely linked because they were made in separate statements, nonetheless were "intimately entangled" with the charged offense, *Toliver, supra,* 468 A.2d at 960, because they similarly provided necessary context for appellant's statement that he was "kinda mellow high" when he shot his nephew. Thus, whatever the merits of admitting evidence of appellant's drug use through other witnesses whose perceptions of appellant's condition could not to the same degree place appellant's statement that he was "kinda mellow high" in context, the admission of the evidence through appellant's own statements to the police was proper as tending to "explain the immediate circumstances surrounding the offense charged...." *Green v. United States,* 440 A.2d 1005, 1007 (D.C. 1982).

Appellant's confession put before the jury appellant's use of drugs and their effect on his physical and mental state at the precise moment of the shooting. The witnesses's somewhat more detailed descriptions of appellant's behavior and their testimony that appellant consumed a greater quantity of drugs than he admitted to in his confession do not seem particularly significant under the circumstances of this case. The challenged evidence was admitted as relevant to appellant's behavior, and any explanation for it, at the precise moment of the shooting. Appellant's confession provided such evidence itself in an equally if not more compelling manner, since the witnesses's testimony could not shed as much light on appellant's perceptions and conduct at the critical moment of the shooting as did appellant's own confession. *Cf. Derrington, supra,* 488 A.2d at 1333 (jury likely to accord more weight to testimony about a voluntary confession

than to testimony from defendant's friends and accomplices).

Nor does the fact that two of the witnesses testified that appellant ingested PCP alter our conclusion that the challenged testimony was essentially cumulative. Neither the prosecutor's arguments nor the trial court's instructions to the jury in any way differentiated PCP from the drugs that appellant stated he had ingested. Likewise, the witnesses's testimony about the effect of the drugs on appellant and his condition near the time of the murder was consistent with appellant's statement that he was "kinda mellow high" at the moment of the offense. In this regard, it is noteworthy that appellant's description of his physical condition and his frame of mind at the time of the offense was part of a detailed confession that was corroborated in important respects. Expert testimony established that the bullets removed from the decedent and the family dog came from appellant's gun, and the trajectories of the bullets that entered the decedent and appellant were consistent with appellant's statements that he was wounded during the struggle with his nephew and that he shot Mark while Mark was running away from him.[9] Appellant's defense at trial, that Bruce Newsome had committed the offenses, was undercut by appellant's failure to implicate Newsome as the perpetrator in his pre-trial statements to the police and by testimony explaining that the police had never sought a warrant for Newsome's arrest because their investigation indicated that Newsome was elsewhere at the time of the crime.

Finally, we note that the government did not seek to emphasize or exploit the evidence of appellant's drug use, particularly the challenged testimony, in the presentation of its case. *Cf. Commonwealth v. Pearson,* 427 Pa. 45, 233 A.2d 552 (1967) (where government emphasizes tainted evidence, error less likely to be harmless), *cited in Derrington, supra,* 488 A.2d at 1333. The government did not refer at all to the evidence of appellant's drug use

---

9. The government argued that appellant's wound was self-inflicted in order to deflect sus-

picion away from appellant, and the evidence was consistent with this theory as well.

during initial closing argument.[10] Indeed, the government's closing argument steered away from the very argument for which the drug evidence was admitted—as a possible explanation for why appellant would have shot his nephew—stating instead that no one knew why appellant had killed his nephew. The government did mention during rebuttal argument that appellant had ingested drugs near the time of the offense, not as an explanation for appellant's murder of his nephew, but rather to counter defense counsel's argument that appellant would not have shot himself so close to the groin area, thereby suggesting that appellant's aim was poor because of his drug use. It thus seems fair to say that appellant's drug use was not a major element of the trial. Rather, the centerpiece of the government's case was that part of appellant's corroborated confession in which he specifically admitted shooting his nephew and the family dog. Under all these circumstances, assuming (but not deciding) error, we can say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Kotteakos, supra,* 328 U.S. at 765, 66 S.Ct. at 1248.

### III

■ Appellant also challenges the trial court's denial of his motion to suppress a .22 caliber Rohm revolver found at the scene by Detective McKinley Williams sometime prior to the arrival of the mobile crime unit.[11] At the suppression hearing, Officer Ronald Williams, who was the first to arrive at the scene, testified that when he arrived a crowd of 80–90 onlookers had already formed. Officer Williams searched the first and second floors of the house for a suspect or another wounded person, but he never noticed the murder weapon. Additional MPD officers arrived within a min-

ute and secured the front and back doors. By this time, a sizeable crowd had formed outside the Settleses's residence, growing from approximately 90 people at the time Officer Ronald Williams arrived to 200 to 300 shortly thereafter. Police cordoned off the back yard with yellow evidence tape, and pushed the crowd back from the front door as well. According to Officer Williams, no one in the crowd succeeded in entering the house, but the crowd, which included a number of hysterical members of the Settles family, pressed against police tape that the responding officers had put around the townhouse, and it took a large number of police officers to maintain order and keep the crowd from entering the premises. There was some evidence that rocks were thrown, and Officer Williams testified that the house was never adequately secured from the crowd.

The detective who located appellant's revolver, Detective McKinley Williams, arrived at the Settleses's house approximately 10–15 minutes after Officer Ronald Williams. At some point in the next 10–15 minutes, a detective at the homicide branch of the MPD telephoned the Settles's residence to say that appellant's friend, Bernard Williams, who had been transported to the homicide branch shortly after the police arrived at the scene, had stated that there was a gun at the house and had described its location. Detective Williams answered the telephone, and immediately thereafter found the gun in plain sight, along the wallboard and sticking out near the back of the dog. Rather than move the gun himself, Detective Williams waited with the gun until the mobile crime unit arrived several minutes later to recover it.

The trial judge credited the testimony about the size and unruliness of the crowd, finding that its behavior threatened the evidence at the scene, thereby creating an exigency that justified the warrantless en-

---

**10.** At the time of the government's opening statement, the trial court had not yet ruled admissible the evidence of appellant's drug use, and the government's opening statement also contains no reference to appellant's drug use.

**11.** The defense initially moved to suppress a wide range of evidence seized from appellant at the D.C. General Hospital and from the scene of the crime, as well as statements by appellant. Appellant stated at oral argument that only the seizure of the revolver is at issue on appeal.

try and continued presence of Detective Williams. There is some evidence from the transcript to suggest that the trial court and the parties focused on the existence of exigent circumstances because of a perception that unless exigent circumstances existed Detective Williams's warrantless search for the gun was unlawful under this court's opinion in *Douglas–Bey v. United States*, 490 A.2d 1137 (D.C.1985) (law enforcement officials could not seize evidence in plain view, some of which had been initially viewed by an officer lawfully on the scene, during a warrantless reentry of the premises). However, this court's opinion in *Clark v. United States*, 593 A.2d 186 (D.C.1991) explained the limits and scope of *Douglas–Bey*, and controls this appeal.

In *Clark*, police arrived at a murder scene, observing in plain view the decedent, what later turned out to be the murder weapon, and an ammunition clip. One-half hour later, a police evidence technician arrived and seized this evidence, as well as a slug, and photographed the body and the scene, even though no warrant had been obtained. This court affirmed the trial court's denial of the motion to suppress the evidence seized by the police evidence technician, concluding that "[a] holding that even though [the first officer lawfully on the scene] had the right to seize the pistol, clip and slug [12] and to photograph the scene, his colleague acted unlawfully in doing so would improvidently exalt form over substance. [Under a contrary view], the result would appear to turn on fortuities such as whether a crime scene search officer happened to be in the [first officer's] patrol car or otherwise immediately available." *Id.* at 198–99 (footnote omitted). The *Clark* court distinguished *Douglas–Bey* on the grounds that in *Douglas–Bey* the officers who seized the evidence

had made a new entry onto premises after the officer who made the initial emergency entry had departed, and that the officer who had made the initial entry in *Douglas–Bey* had not seen the evidence that was a principal focus of the suppression motion. *Clark, supra,* 593 A.2d at 197.

The reasoning of *Clark* is fully applicable to this case. As appellant concedes, Officer Williams's initial warrantless entry and limited search in response to the reported shootings was permissible under the Fourth Amendment. *See, e.g., Mincey v. Arizona,* 437 U.S. 385, 392, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978). Furthermore, it cannot be disputed, particularly in light of the trial court's factual findings concerning the size and behavior of the crowd,[13] that Officer Williams's continued presence at the scene of the murder less than 30 minutes after his arrival, and before the bodies had been removed, was lawful. *See Clark, supra,* 593 A.2d at 197–98 (officers who first arrived at murder scene had remained on premises for a "reasonable time" when police evidence technician arrived 30 minutes later and body had not yet been removed). Even if the exigency justifying a full-scale warrantless search of the premises had passed by the time the detective called from the homicide office to warn of a gun on the premises, there is no doubt that under prior case law a more limited exigency arose that justified the limited protective search for the weapon in the very spot where Bernard Williams had stated it would be. *See, e.g., Sturdivant v. United States,* 551 A.2d 1338, 1342 (D.C. 1988) ("[T]he presence of [a revolver] creates a special exigency because of [its] potential threat to human life") (citing cases), *cert. denied,* 493 U.S. 956, 110 S.Ct. 370, 107 L.Ed.2d 356 (1989). At least after *Clark*, the lawfulness of the search cannot

---

**12.** The court noted that whether the slug was lawfully seized presented a more difficult issue because the first officer lawfully on the scene had not noticed it, but concluded that it need not decide the issue because the appellant had not raised the issue and because the slug was of "minimal significance" in relation to the evidence as a whole. 593 A.2d at 198 n. 25.

**13.** The trial court's factual findings underlying its conclusion that exigent circumstances existed were not clearly erroneous. *See Gant v. United States,* 518 A.2d 103, 107 (D.C.1986); *Brooks v. United States,* 367 A.2d 1297, 1302 (D.C.1976); D.C.Code § 17–305(a) (1989). To the extent that the trial court's findings may have contained minor factual misstatements, as argued by appellant, those misstatements are immaterial to our affirmance based on *Clark.*

rationally turn on the fortuity of which officer—the first or the second to arrive—answered the telephone and thus learned of the presence of a gun at the scene, for it would "improvidently exalt form over substance," 593 A.2d at 198, to hold that even though Officer Ronald Williams could have searched for the gun had he answered the phone, the same search violated the Fourth Amendment because Detective McKinley Williams answered the phone and hence conducted the search. Accordingly, the seizure of the gun by the mobile crime unit was not unlawful. *Id.; see also Gant, supra,* 518 A.2d at 108.

## IV

■ Finally, we address briefly appellant's claim that the prosecutor deprived him of a fair trial by appealing to the passions and prejudices of the jury in her opening statement and rebuttal argument. The prosecutor's challenged comments in the instant case generally were of two types: those tending to portray the decedent in a sympathetic light, and those that attacked appellant's credibility. The comments in the former category generally made the obvious point that the murder was especially tragic because the decedent was a twelve-year-old boy. In this sense, it was the fact of the boy's death, rather than any argument based on that fact, that carried with it the greatest emotional impact. Although the prosecutor's speculative remarks in rebuttal argument about the promising future that lay before the decedent fall into the category of those that would have been better left unsaid, the remarks do not, under our prior precedents, constitute a basis for reversal. *See Dixon v. United States,* 565 A.2d 72, 76–78 (D.C.1989) (prosecutor's comments that victim would not know his children and that they would grow up fatherless did not warrant reversal under harmless error standard where jury had to know that children would not know their father); *cf. Powell v. United States,* 485 A.2d 596, 600 (D.C.

1984) (although it was error for government to argue that the victim would have to look at his scars every day for the rest of his life, this comment merely stated the obvious and was an isolated remark in an otherwise proper summation), *cert. denied,* 474 U.S. 981, 106 S.Ct. 420, 88 L.Ed.2d 339 (1985). Under the circumstances here, where the government's case was fairly strong, the argument did not stray too far from facts that must have been apparent to the jury, and the trial court instructed the prosecutor to confine her remarks to the evidence and later instructed the jury to determine the facts without prejudice, appellant did not suffer "substantial prejudice" as a result. *Portillo v. United States,* 609 A.2d 687, 690 (D.C.1992).[14]

Nor can we conclude that the prosecutor's comments attacking appellant's credibility, which included referring to appellant as a "self-centered coward" whose explanations so contradicted each other that he "reminds you [the jury] of an octopus because ... when an octopus is scared in water, [he] lets out a black ink," warrant reversing appellant's convictions under the circumstances of this case. Although as a general matter "name calling is out of bounds," *Irick v. United States,* 565 A.2d 26, 36–37 (D.C.1989), "a bland presentation robs the adversary system of the life and zest which are needed to capture and retain the jury's attention and ensure an interested and informed search for the truth." *Id.* at 37 (prosecutor's references to defendant as "Dirty Harry" and "the enforcer," even if error, did not warrant reversal where these references added little to the evidence itself). We assume that the prosecutor's dramatic remarks crossed the line separating permissible advocacy from an unwarranted attack on appellant's character, though there was ample evidence from which one could infer that appellant had been less than forthright from the beginning. Of much greater importance, however, were the corrective actions taken to dispel any prejudice created by the prosecutor's remarks and the apparently emotional

---

14. For these reasons as well, the prosecutor's similar statements in her opening statement, which we review for plain error, are not a ground for reversal. *See Mills v. United States,* 599 A.2d 775, 787 (D.C.1991).

manner in which she delivered them. Near the end of rebuttal, when the prosecutor emphasized that the appellant was a "self-centered coward," the trial judge stated:

> I wish to remind the jury, that the personality of the defendant or the personal character or the personal traits of the defendant are of no concern to this jury. The jury's job in a little while will be to figure out what the evidence shows about what did or did not happen on the day in question.... Personal character traits or personality traits are not this jury's concern.

In addition, the trial judge gave defense counsel three minutes of surrebuttal to respond to the prosecutor's remarks. In light of the substantial corrective action taken by the trial judge, coupled with the fact that most of the government's lengthy closing and rebuttal arguments focused on reciting the considerable evidence implicating appellant as the perpetrator, this court can say with assurance that even if the argument was improper, the judgment was not substantially swayed as a result. *Id.* at 32.

*Affirmed.*