*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 22-FS-0138

IN RE T.B., APPELLANT.

Appeal from the Superior Court
of the District of Columbia
(2021-DEL-000434)

(Hon. Andrea Hertzfeld, Trial Judge)

(Argued November 6, 2024                    Decided February 20, 2025)

*Jennifer Williams*, Public Defender Service, with whom *Samia Fam* and *Shilpa S. Satoskar*, Public Defender Service, were on the brief, for appellant.

*Brian L. Schwalb*, Attorney General for the District of Columbia, with whom *Caroline S. Van Zile*, Solicitor General, *Ashwin P. Phatak*, Principal Deputy Solicitor General, *Graham E. Phillips*, Deputy Solicitor General, and *Stacy L. Anderson*, Senior Assistant Attorney General, were on the brief, for appellee.

Before HOWARD and SHANKER, *Associate Judges*, and THOMPSON, *Senior Judge.*

THOMPSON, *Senior Judge*: The Superior Court adjudged T.B., a juvenile, delinquent for having carried a pistol without a license and possessed unregistered ammunition. In this appeal from the order of delinquency, T.B. contends that the evidence presented at trial was insufficient to support the court's findings that he was involved in those offenses. Alternatively, T.B. argues that the trial court committed reversible error by admitting portions of the testimony of two police

officers who participated in the investigation that led to his arrest.  Because we find that the evidence at trial was sufficient and that T.B. has not shown prejudice from or plain error in admission of the officers' challenged testimony, we affirm.

## I. Background

During a suppression hearing on November 8, 2021, Officer Carter Moore of the Metropolitan Police Department ("MPD") described the events that led up to T.B.'s arrest.  On July 26, 2021, Officer Moore was monitoring publicly available social media posts looking for illegal firearms when he came across an Instagram live video featuring an individual—later identified as T.B.—showing to the camera a black Glock-style handgun.  In this video (the "first video"), which Officer Moore recorded in screen shots on his cell phone, T.B. at times held the firearm in his hands and at other times placed it in, had it tucked in, or removed it from his waistband.  Another juvenile appears toward the end of the video.  Because the video took place entirely inside a building whose exact location the officers did not know, they took no further action at that time.

About six hours later, around 8:40 p.m., Officer Moore observed a second Instagram live video (the "second video") in which T.B. and "D.C.," another juvenile appeared.  The video, which Officer Moore "screen recorded," opens with D.C.'s face and then shows, in D.C.'s waistband, what Officer Moore described as

"the grip" of a distinctive "illegal firearm" that Officer Moore believed to be the grip of the same black handgun from the first video. As the second video continues, a second individual—T.B., the parties agree—is briefly visible in the background, leaning against the railing of a stoop. In the trial court's words, as T.B. "flashes his waistband briefly, a light-colored object can be seen in his front waistband in front of his black underwear."

From the second video, police were able to identify the location as the Mayfair Mansion Apartments in the 3700 block of Hayes Street, N.E. A group of MPD officers, including Officer Moore and Officer Max Laielli, headed to that location, arriving about twenty minutes after having viewed the second video. Officer Laielli was the first to spot the individuals from the Instagram live videos and approached them immediately. As Officer Laielli began his approach, his body-worn camera ("BWC") captured footage depicting T.B. standing on the sidewalk, about to ascend the stairs to the stoop along with two other unnamed individuals. D.C. can be seen standing at the top of the stoop on the right. As Officer Laielli continued his approach, the two unnamed individuals and T.B. proceeded to the top of the stoop. Officer Laielli's BWC footage depicts T.B. standing on the right side of the stoop facing D.C. with his back to the officer. T.B. then turns to face the left-side railing and takes a step in that direction while looking down and raising his hands to his waistband. Officer Laielli testified that

in the BWC footage it "looks like [T.B.'s] elbows [were] kind of tucked up, almost as if he's doing something in front of him." T.B. then takes one more step towards the left-side railing, becoming partially obscured by the two unnamed individuals who by now are standing on the left side of the stoop facing Officer Laielli. T.B. then takes a step back with his left foot and pivots his body to face Officer Laielli, who by this point has reached the stoop. T.B.'s shirt can then be seen resting slightly above his waistband, with a small portion of his black underwear showing.

Officer Laielli immediately handcuffed D.C. and located, in D.C.'s waistband, the black Glock-style handgun from the videos. Officer Moore arrived shortly thereafter and ordered the three remaining individuals, including T.B., to step down off the stoop. Officer Moore then handcuffed T.B., whom he recognized as "the other individual" from the second video and patted him down, finding nothing in his waistband. Officer Moore then proceeded to search the area, finding two more firearms—a loaded "tan-gold-in-color semiautomatic pistol" and a black revolver—on the ground to the left of the stoop.[1] The tan-gold pistol was found "directly over the railing" by the wall of the building, close to where T.B. had been standing by the left-side railing.

---

[1] The "tan-gold-in-color" pistol is also referred to in the record as "the light black-and-tan firearm," the "tan-and-black firearm," and "a tan-colored semiautomatic firearm."

The Superior Court incorporated into the trial the entirety of Officer Moore's testimony from the suppression hearing. In the court's suppression-hearing findings that were incorporated into the court's trial findings, the court referred to T.B.'s possession of a firearm in the first video as a circumstance that supported suspicion that "he was involved in an ongoing criminal offense" at the time the police arrived at the Hayes Street address.

During the trial, the court also heard testimony from Officer Laielli and admitted into evidence the entirety of both Instagram live videos, still shots taken from those videos, footage from Officer Moore's BWC, the "tan-gold-in-color" pistol and corresponding ammunition, and the black handgun recovered from D.C. and the corresponding ammunition and magazine. The government also introduced footage from Officer Laielli's BWC and showed it frame by frame, pausing occasionally to let the officer describe his observations as the video progressed.

The court credited the entire testimony of Officers Moore and Laielli and, after incorporating the factual findings made at the earlier suppression hearing, found that "the totality of the circumstantial evidence demonstrated beyond a reasonable doubt that [T.B.] did have a loaded pistol [i.e., the "tan-gold-in-color" pistol] in his waistband immediately prior to his arrest by the police." The court

committed T.B. to the custody of the Department of Youth Rehabilitation Services ("DYRS") for a period not to exceed one year.

During the disposition proceeding, the court told T.B. that although it entered a judgment of acquittal on the CPWL charge that was based on T.B.'s possession of a pistol in the first video, "I knew you had a gun on you then, too." Regarding the CPWL charge as to which T.B. was not acquitted, the court commented that the offense was "not a one-off occasion where something like this happened" and said to T.B., "that's really concerning to me – not just that you had a gun on you once, but twice. And that not only did you have it, but you thought there was some reason that you should be broadcasting that to the world that you had it."

On appeal, T.B. argues that the evidence at trial was insufficient to prove, beyond a reasonable doubt, that he possessed the tan-gold-in-color firearm recovered from the scene. T.B. emphasizes that this case involves only circumstantial evidence and argues that the government's case rested "solely" on a stack of assertedly "weak" inferences. He contends that these inferences, "while plausible," cannot "bear the weight of proof beyond a reasonable doubt."

Alternatively, T.B. argues that even if the evidence was sufficient, the Superior Court erred when, over defense objection, it allowed Officers Moore and Laielli to "interpret and narrate the Instagram video as lay witnesses" and to testify

to their opinions that T.B. "displayed characteristics of an armed gunman in the video." T.B. asserts that because the court "expressly relied on the improperly admitted testimony," the error was not harmless and reversal is required.[2] The government defends the trial court's findings based on the totality of the evidence and also argues that T.B. either waived or forfeited his right to challenge on appeal admission of the officers' challenged testimony.

## II. Applicable Law

The Superior Court found T.B. "involved" in a violation of D.C. Code § 22-4504(a) (providing that "[n]o person shall carry within the District of Columbia either openly or concealed on or about their person, a pistol, without a license issued pursuant to District of Columbia law") and D.C. Code § 7-2506.01(a)(3) (possession of unregistered ammunition). "[C]arrying can be established through actual possession of the pistol on [the] person or constructive possession about [the] person." *Taylor v. United States*, 267 A.3d 1051, 1059 (D.C. 2022) (internal quotation marks omitted). Actual possession may be

---

[2] T.B. also urges that, if we find that the evidence was sufficient, we should "exercise [our] discretion" to dismiss the petition rather than remand for a new trial, because doing so would be "just in the circumstances" given that T.B has "already completed his commitment" with DYRS and moved out of this jurisdiction.

"established by either direct or circumstantial evidence." *Johnson v. United States*, 40 A.3d 1, 14 (D.C. 2012).

"We review the sufficiency of the evidence de novo," *Fitzgerald v. United States*, 228 A.3d 429, 436 (D.C. 2020), and consider "*all* the evidence admitted at trial, including the evidence appellant claims should have been excluded, regardless of whether the court erred in admitting it." *Gore v. United States*, 145 A.3d 540, 545 n.7 (D.C. 2016) (emphasis in original). We view the evidence "in the light most favorable to sustaining the judgment," *Davis v. United States*, 834 A.2d 861, 866 (D.C. 2003), and "mak[e] no distinction between direct and circumstantial evidence," *Cherry v. District of Columbia*, 164 A.3d 922, 929 (D.C. 2017) (citation omitted). Our "review is deferential, giving full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."[3] *Davis*, 834 A.2d at 866 (citation and internal quotation marks omitted). But if, in order to convict, "the [factfinder] [was] required to cross the bounds of permissible inference and enter the forbidden territory of conjecture and speculation," then the evidence is insufficient. *Curry v. United States*, 520 A.2d 255, 263 (D.C. 1987).

---

[3] "[A]n inference is a factual conclusion that can rationally be drawn from other facts." *Smith v. State*, 999 A.2d 986, 991 (Md. 2010).

In a case like this one, "built solely on circumstantial evidence and the inferences drawn from that evidence, we are mindful of the high, demanding standard of proof in a criminal case." *James v. United States*, 39 A.3d 1262, 1270 (D.C. 2012). "The reasonable doubt standard of proof requires the factfinder 'to reach a subjective state of near certitude of the guilt of the accused.'" *Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (quoting *Jackson v. Virginia*, 443 U.S. 307, 315 (1979)). "This requirement means more than that there must be some relevant evidence in the record in support of each essential element of the charged offense." *Id.* "Slight evidence is not sufficient evidence; a 'mere modicum' cannot 'rationally support a conviction beyond a reasonable doubt.'" *Id.* (quoting *Jackson*, 443 U.S. at 320). Even so, "[t]he evidence need not *compel* a finding of guilt beyond a reasonable doubt, and it need not negate every possible inference of innocence." *Napper v. United States*, 22 A.3d 758, 770 (D.C. 2011) (emphasis added) (citation and internal quotation marks omitted). Rather, "proof of guilt is sufficient if . . . *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Davis*, 834 A.2d at 866 (citation and internal quotation marks omitted).

### III. Sufficiency of the Evidence

Examining all the evidence admitted at trial as a whole, we are satisfied that it was sufficient to prove T.B. had actual possession of the tan-gold-colored

firearm. While the trial court did have to make a number of inferences to reach that conclusion, it is well-established that the finder-of-fact "is permitted to infer from one fact the existence of another essential to guilt, if reason and experience support the inference" and that "proof of the first fact [can] furnish[] a basis for inference of the existence of the second." *Tot v. United States*, 319 U.S. 463, 467 (1943). Moreover, while "[i]t is elementary that the burden is upon the government to prove each and every element of the crime beyond a reasonable doubt," *Geddie v. United States*, 284 A.2d 668, 669-70 (D.C. 1971) (internal quotation marks omitted), the government's burden "does not operate upon each of the many subsidiary facts on which the prosecution may collectively rely to persuade the [finder of fact] that a particular element has been established beyond a reasonable doubt." *United States v. Viafara-Rodriguez*, 729 F.2d 912, 913 (2d Cir. 1984).

T.B. focuses first on the inference that the object that can be seen in T.B.'s waistband in the second video was the recovered "tan-gold-in-color" gun, and not a different object, such as a cell phone or drugs. We agree that this was a critical set of inferences, but we are satisfied that they were supported by much more than a modicum of evidence. As to the inference that the object in T.B.'s waistband in the second video was a gun, there was, to begin, what the trial court referred to as "the observations of [the] officers regarding [T.B.'s] behavioral characteristics" in

the second video. Specifically, there was Officer Moore's testimony that in the second video, in which another individual was flashing a firearm, T.B. was displaying the "characteristics of an armed gunman" in that he could be seen adjusting an object at his waistline that was not consistent with the male anatomy and that appeared to be "heavy-weighted."[4] Officer Laielli similarly described T.B.'s actions shown in the second video as displaying the characteristics of an armed gunman, in that T.B. was "flashing" his waistband to "try[] to show something off."

In addition, having viewed T.B. displaying a gun in the first video, the court had an additional basis for inferring that the briefly flashed object in T.B.'s waistband in the second video was also a gun. While T.B.'s counsel asserted during oral argument that drawing an inference from T.B.'s displaying of a gun in the first video would amount to relying on propensity evidence, that conclusion is debatable at the very least.[5] But even if arguendo the evidence from the first video

---

[4] We discuss *infra* T.B.'s claim that it was error to admit this testimony. Regardless, we may properly rely on it in our analysis of sufficiency of the evidence. *See Gore*, 145 A.3d at 545 n.7.

[5] As noted above, in the trial court's suppression-hearing findings that were incorporated into its trial findings, the court referred to the circumstance of T.B.'s being "involved in an ongoing criminal offense" at the time the police arrived at the Hayes Street address. This court observed in *Johnson v. United States*, 683 A.2d 1087 (D.C. 1996) (en banc), that "*Drew* [*v. United States*, 331 F.2d 85 (D.C. Cir. 1964)] made it abundantly clear that its prohibition [against so-called "other

was propensity evidence, it is evidence that can be taken into account for purposes of determining whether the evidence was sufficient for conviction. See supra note 4.

---

crimes" or propensity evidence] was directed at crimes independent of the crime charged." *Id.* at 1096 ("[T]he *Drew* court concluded in relevant part that when 'the two crimes arose out of a continuing transaction or the same set of events' the danger of admitting evidence of both in one trial is minimal."); *see also Toliver v. United States*, 468 A.2d 958, 960-61 (D.C. 1983) (stating that "other crimes evidence is admissible when relevant to explain the immediate circumstances surrounding the offense charged," and citing authority that "[e]vidence of an uncharged offense arising out of the same transaction or series of transactions as the charged offense is not an extrinsic offense within the meaning of [other crimes evidence]." (internal quotation marks omitted)); *Parker v. United States*, 586 A.2d 720, 724 (D.C. 1991) (observing that *Toliver* and its progeny support "the uncritical admission of bad acts and other crimes evidence that is so intertwined with the charged conduct that the latter is unclear without the former, but only where there is a close temporal relationship.").

Moreover, "[e]vidence of other crimes is admissible when relevant to . . . intent[.]" *Drew*, 331 F.2d at 90. Here, as described above, the trial court regarded the first video as establishing that T.B.'s intent, in displaying his waistband for the camera that was recording a video for Instagram, was to broadcast that he had a gun on his person. At least arguably, under the *Drew* intent exception, the trial court could permissibly infer that T.B.'s displaying of the light-colored object in his waistband in the second video evinced the same intent: to broadcast that he had a gun on his person. *Cf. Legette v. United States*, 69 A.3d 373, 385 (D.C. 2013) ("If a person acts similarly in similar situations, he probably harbors the same intent in each instance, and . . . such prior conduct may be relevant circumstantial evidence of the actor's most recent intent. The inference to be drawn is not that the actor is disposed to commit such acts; instead, the inference to be drawn is that, in light of the first event, the actor, at the time of the second event, must have had the intent attributed to him by the prosecution.") (brackets and internal quotation marks omitted).

We turn next to the further inference that the gun in T.B.'s waistband in the second video was the recovered gun. The court had before it Officer Laielli's testimony and the court's own perception that the object that can be seen in T.B.'s waistband in the second video was "light-colored" or "in a lighter color" by comparison to T.B.'s black underwear. T.B. suggested at oral argument that the court's findings merely tracked the officer's testimony, but we have no reason to doubt that the court understood that "it was for the [court as the finder-of-fact] to decide what the video footage showed."[6] *Callaham v. United States*, 268 A.3d 833, 848-49 (D.C. 2022); *see also Bernal v. United States,* 162 A.3d 128, 134 n.11 (D.C. 2017) ("Judges are presumed to know the law."). The court also heard evidence that the officers found nothing in T.B.'s waistband when they stopped him, but found the tan-gold-in-color pistol on the ground below the railing where T.B. had been standing just before he was patted down. From the foregoing evidence, the court could reasonably infer that the light color seen in the second video was the tan-gold-in-color recovered gun, which T.B. had in his waistband twenty minutes before the police arrived, but discarded when the officers approached the stoop. The trial court "was not required to attribute to coincidence

_____

[6] For example, the court found "based on its viewing of the videos," that T.B. "is clearly the person depicted" in both the first and the second video.

the discovery" of the tan-gold-in-color pistol on the ground below where T.B. had been standing in front of the stoop railing.[7] *In re A.L.*, 839 A.2d 678, 679-80 (D.C. 2003). The inference was made all the more reasonable by the fact that the second video showed on the ground no other objects (such as, T.B.'s brief suggests, a cell phone, a wallet, a bag of drugs, or a knife) that T.B. might have discarded. The inference was also supported by the testimony that the recovered pistol was dry even though it had been raining before the police arrived[8]—supporting an inference that it had been placed on the ground shortly before police discovered it.

To summarize the foregoing, T.B. was seen displaying a gun in his waistband in the first video; then, hours later the same day, he was seen in the second video flashing, in the manner of an armed gunman, a light-colored object in his waistband (while his companion displayed the gun seen in that first video); and then, about twenty minutes later, a light-colored, discarded, loaded gun—dry even though it had been raining—was found on the ground just below where T.B. had

---

[7] After watching his BWC footage, Officer Moore testified that he recovered the tan-gold-in-color pistol from the ground on "the side of the bannister directly next to where [T.B.] was standing." After watching his BWC footage, Officer Laielli testified that when he arrived on the scene, T.B. was standing "on the left side by the railing" closest to where the "tan-colored semiautomatic firearm" was thereafter recovered "on the ground on the left side of the stoop."

[8] Officer Moore testified that there was no indication that the tan-gold-in-color pistol had been exposed to the weather, despite it having rained all day.

been standing moments earlier. Taken together, this evidence allowed the trial court to infer that there had been ongoing criminal activity that day and to infer beyond a reasonable doubt that T.B. had carried the recovered gun just before police found it on the ground.

T.B. argues, however, that, to arrive at its adjudication that he was "involved" in CPWL and UA, the trial court also had to infer that he still had the gun on his person twenty minutes after the officers' live viewing of the second video. That inference, he argues, was based on mere speculation, and did not take into account that the BWC video shows him walking toward the stoop as the officers arrived. It is just as likely, he asserts, that he returned home or went elsewhere to meet a friend or otherwise left the immediate area during the twenty-minute interval, and had an opportunity to leave behind whatever was seen in his waistband in the second video.[9] But it is T.B.'s brief that engages in speculation in positing such activity during the twenty-minute interval,[10] and, in any event, it was

---

[9] Of course, the trial court as finder-of-fact was not compelled to accept the posited innocent explanation of what occurred during the twenty-minute interval. *See Wagman v. District of Columbia*, 148 A.2d 308, 310 (D.C. 1959).

[10] During the suppression hearing and trial, T.B.'s counsel emphasized in her questioning that T.B. seemed to be wearing sweatpants in the first video, but some other type of pants at the time of his arrest, questions that seemed directed at establishing that, in the course of the day, he went somewhere where he could change clothes (though the change does not seem to have occurred between the time of the second video and the officers' arrival at Hayes Street).

not necessary for the trial court to infer that T.B. still had the gun seen in the second video on his person as the police officers approached. The BWC video shows that T.B. stood facing and engaging with D.C., with his back to the approaching officers, his hands raised to his waist in front of his body and his elbows tucked up when viewed from behind, before the officers reached the stoop. For all we know, T.B. might have transferred the tan-gold-colored gun to his waistband in that moment. The trial court did not need to make a finding about whether T.B. "still had" the light-colored gun when police arrived at the scene (or whether he had possession of the gun during the entire twenty minute interval, or whether instead he re-acquired it just after the police arrived) to be able to make a further inference that T.B. deposited the pistol on the ground when he stood facing the left-side railing with his arms raised toward his waistband just before he was apprehended.[11]

---

[11] Even though there was no testimony that any of the officers saw T.B. in possession of the firearm at the scene, we have never required such direct evidence to support a finding of actual possession. *See, e.g.*, *Hooks v. United States*, 191 A.3d 1141, 1144-45 (D.C. 2018) (jury properly inferred that defendant possessed revolver where police heard a "loud, metallic noise just before [defendant] moved his hand away from the opening in" a dumpster where the revolver was subsequently found, despite no officer actually seeing defendant in possession of the revolver); *White v. United States*, 714 A.2d 115, 118 (D.C. 1998) (court could "reasonably infer" that defendant had a gun in his hand despite the officer never seeing defendant actually possessing it). And, in any event, the officers *did* see on

The third required inference, T.B. argues, was that he "tossed" something over the left side railing. The trial court did find that T.B. "tossed" something over the railing, but T.B.'s precise movement was not critical. The court could just as readily have found that T.B. discarded the object in his waistband by dropping it "directly over the railing" with an outstretched arm.[12]

The fourth required inference, T.B. argues, was that the recovered gun was deposited onto the ground by T.B. and not put there by one of the other individuals on the stoop or by some other resident of the housing complex. T.B. asserts that the trial court "did not address the other young man, also partially visible in Officer Laielli's [BWC] footage, who was seen standing closer to the abandoned gun than T.B. was," and who "also turned away from police as they arrived at the scene." We see in the record no basis for T.B.'s assertion that the other young man was standing closer to the recovered gun than T.B. was. As the government notes, the still photo from the BWC footage shows that the gun was found next to the building wall, while the young man in question was standing at the middle of the railing, between T.B. and another young man in a blue T-shirt, farther away from

_____

video a light-colored, heavy-looking object in T.B.'s possession prior to recovering the tan-gold-in-color pistol from the ground.

[12] Officer Laielli testified that Officer Moore "didn't have to search" for the gun because "[h]e could see it from the railing." T.B.'s counsel acknowledged that the bush under which the gun was found was "right next to" the railing.

the wall and the gun than T.B. was. And, in any event, the presence of the young man in question, who T.B. asserts "displayed behavior similar to that of T.B.," does not weaken or render speculative the inference that T.B., and not this other young man, caused the tan-gold-colored pistol to be on the ground. That is because there was a second gun (a revolver) on the ground that the other young man might have discarded, and because only T.B. was seen with a light-colored object in his waistband that was consistent with the tan-gold-in-color pistol.

We do not believe that the facts of this case differ in any material way from the facts of *A.L.*, where we were satisfied that the evidence was sufficient to prove that A.L. had possessed a bag of marijuana that was found stuffed in a drain pipe in a stairwell that A.L. spent a few seconds in after police saw him from a distance with a "shiny object "in his hand.[13] For that and all the foregoing reasons, we

---

[13] We reasoned:

> Officer Shumac had no reason to proceed to the stairwell unless he first saw A.L. go there with suspected contraband in his possession. Immediately after A.L. left the stairwell, Shumac followed him there and found the contraband in the stairwell. The officer testified that the bag he found was consistent with, i.e., looked like, the shiny object he had previously seen in A.L.'s possession. The judge was free to credit this testimony, and he was not required to attribute to coincidence the discovery, in the stairwell to which A.L. had hastened upon seeing the police, of a plastic bag resembling the one he had seen in A.L.'s hand.

conclude that the evidence in totality was sufficient to support the trial court's findings that T.B. was involved in CPWL and UA.

## IV. Erroneous Admission of Evidence

T.B. argues that even if the evidence admitted at trial was sufficient to prove beyond a reasonable doubt that he was involved in the charged offenses, reversal is required because the Superior Court's conclusions were "substantially swayed"[14] by erroneously admitted testimony on which the court expressly relied.

More specifically, T.B. contends that the officers should not have been permitted to narrate the second video because they "did not personally witness the events depicted in the Instagram video that they narrated" and thus were not testifying based on personal knowledge. T.B. further contends that the officers' testimony about T.B. exhibiting the characteristics of an armed gunman constituted improper lay-opinion testimony because it was not based on their personal experiences and observations but on specialized training they received from the MPD and/or the U.S. Army. The government asserts that T.B. either forfeited or waived his challenges to the officers' narration testimony because he did not lodge a timely objection to either officer's testimony and, as to Officer Moore's

---

*A.L.*, 839 A.2d at 679-80.

[14] *Kotteakos v. United States*, 328 U.S. 750, 765 (1946).

testimony, declined to lodge an objection when the court asked whether he objected to incorporating Officer Moore's testimony into the trial record.

Our review of the record confirms that during Officer Moore's testimony, T.B.'s trial counsel did object to the officers' lack of personal knowledge of the context of the Instagram videos so as to be able to authenticate them. Counsel did not, however, object that Officer Moore lacked personal knowledge that would enable him to interpret what the video showed (e.g., that T.B. was "adjusting something in his waistline"). Thus, we agree with the government that T.B forfeited his objection to Officer Moore's narration. Moreover, although the trial court gave counsel an opportunity to object to incorporation of Officer Moore's testimony as trial evidence, trial counsel stated that she had no objection, thereby waiving the lack-of-personal-knowledge argument T.B. now advances.

Trial counsel did raise a "[l]ack of personal knowledge" objection to Officer Laielli's testimony that T.B. "appeared to be flashing his waistband" and "trying to show something off" in the background of the second video. And while counsel did not state an objection to Officer Laielli's further testimony that "there appeared to be something in a lighter color in the front of [T.B.'s] waistband" in the second video, the court had overruled counsel's "[l]ack of personal knowledge" objection raised a page earlier in the trial transcript, so we do not take that non-objection as a forfeiture. *See Mercer v. United States*, 724 A.2d 1176, 1182 (D.C. 1999) ("An

objection may be considered timely, even if not made at the moment a question is asked, so long as the objection gives the trial court an opportunity" to "take appropriate and effective corrective action." (internal quotation marks omitted)).

Our case law establishes that "lay witness testimony generally must be based on personal knowledge" and that personal knowledge cannot be gained merely by watching video footage. *See Callaham*, 268 A.3d at 848 (rejecting the government's argument that detectives "'witnessed' the events in question—and thereby obtained personal knowledge of them—solely by watching recorded surveillance footage"). We therefore agree that it was error to admit Officer Laielli's narration of the second video. However, from our review of the transcript, we are satisfied that the court's findings about what T.B. was doing in the second video were based on the court's own "close[]" viewing of the video evidence and interpretation of what it showed, and not on mere acceptance of Officer Laielli's (or Officer Moore's) narration. We focus in particular on the court's "can be seen" and "is seen" formulations: i.e., its statement that in the second video, "when the defendant flashes his waistband briefly, a light-colored object can be seen in his front waistband in front of his black underwear"; and its statement, one transcript page later, that T.B. "can be seen flashing his waistband and . . . a light-colored object is seen in front of his black underwear[.]" Further, from our own viewing of the video and still images, we judge that they permitted

the trial court to draw those conclusions about what the footage showed. Accordingly, we conclude that the improperly admitted narration was harmless and does not entitle T.B. to reversal.[15]

As noted, the second part of T.B.'s argument focuses on Officer Moore's and Officer Laielli's testimony that T.B. was displaying the characteristics of an armed gunman. Specifically, Officer Moore testified that in the second video, in which another individual was "flashing a firearm" in his waistband, T.B., too, was "giving characteristics of an armed gunman" in that he "was adjusting something that was not consistent with the male anatomy," and that "looked to be a heavy-weighted object," in the front of his pants. Officer Moore told the court that he knew the characteristics of an armed gunman based on having "been trained with the Metropolitan Police Department, as well as the United States Army Criminal Investigation Command, on how to detect an individual who has possession of a firearm." T.B.'s trial counsel did not object when Officer Moore first said that

---

[15] To the extent that Officer Moore's suppression-hearing testimony about the officers' belief that T.B. had a gun on him in the second video had the potential to shape the court's perception of what it saw in that second video, that possibility seems unavoidable. The testimony was necessary to explain to the court why the officers had reasonable articulable suspicion to stop and frisk T.B. as soon as they arrived at the stoop. In any event, because we have already held that T.B. forfeited or waived any objection to Officer Moore's suppression-hearing narration about what he believed he saw in the second video, any indirect influence that testimony might have had on the court's own perception of the video is not a basis for reversal.

T.B. exhibited the characteristics of an armed gunman and cited his training as the basis for his opinion, but counsel did object the second time Officer Moore made the statement. Thus, the court was apprised of the objection in time to consider whether to rely on the opinion in making its findings. *See Mercer*, 724 A.2d at 1182. And, although T.B. did not object to incorporating Officer Moore's testimony, the trial court did say that it intended not to incorporate hearsay testimony into the trial record, and the government asked the court to incorporate into the trial "all relevant non-hearsay testimony." To the extent Officer Moore's testimony was based on his training—i.e., was based on what he was taught—rather than on his experience, it at least arguably was hearsay. That is, it was hearsay to the extent it can be understood as a statement that Officer Moore was taught during his training that a man exhibits the characteristics of an armed gunman if, in a video in which another individual is seen flashing a firearm, he is seen adjusting, in the front of his pants, a heavy-weighted object not consistent with the male anatomy.[16] *Cf. State v. Hill*, 387 P.3d 112, 115-17 (Idaho 2016) (holding that a

---

[16] It may be that Officer Moore was simply describing what he saw that made him suspicious; he gave the testimony under discussion in response to the question, "what, specifically, about that video gave you reason to believe that that individual was armed?" But that question and response followed immediately after he was asked to explain how he knew that T.B. was "giving characteristics of an armed gunman," a question he answered by citing his training with the MPD and Army "on how to detect an individual who has possession of a firearm."

police deputy's testimony, about what he was taught in the police academy regarding what a certain result on a field sobriety test indicates, was hearsay).

Assuming without deciding that Officer Moore's characteristics-of-an-armed-gunman testimony was hearsay, we shall further assume without definitively deciding that T.B. neither forfeited nor waived an objection to the testimony and that the testimony was erroneously admitted as trial evidence.[17] We also note that the trial court expressly cited Officer Moore's testimony in finding that T.B. "appeared to have the characteristics of someone carrying a gun, including having something that [Officer Moore] believed consistent with a firearm in his pants." However, Officer Moore's opinion added little or nothing to Officer Laielli's similar opinion, discussed below, and we therefore cannot find that allowing Officer Moore's testimony constituted reversible error.[18]

---

[17] We acknowledge the point, made in the government's brief, that the rules of evidence, including the rules regarding expert and lay-witness opinion testimony, may not apply at suppression hearings. *See Matoumba v. State*, 890 A.2d 288, 292-93 (Md. 2006) (holding that, under Maryland's rules of evidence, a police officer need not be qualified as an expert at the suppression hearing because the rules of evidence do not apply). However, we need not resolve that issue here since Officer Moore's suppression-hearing testimony other than hearsay was incorporated into the trial evidence.

[18] *See Settles v. United States*, 615 A.2d 1105, 1109 (D.C. 1992) ("Relevant to a determination of whether error (assumed or actual) in admitting certain evidence is harmless is the degree to which the evidence is cumulative of other, properly admitted evidence.").

Officer Laielli testified that "[t]hrough [his] experience and training with the [MPD] Crime Suppression Team," he had "come to recognize what characteristics of armed gunmen are" and that T.B. was displaying such characteristics through "[t]he flashing of the waistband." As T.B.'s trial counsel did not object to Officer Laielli's testimony and raises for the first time on appeal his argument that Officer Laielli was erroneously allowed to give improper lay-opinion testimony, our review is for plain error.[19]

T.B. contends that it is plain under this court's opinion in *King v. United States*, 74 A.3d 678 (D.C. 2013), that police officers may not give lay-opinion testimony that is based at least in part on their training. (T.B. also contends that Officer Laielli's testimony was based not on the officer's personal experience, but instead on his special training and specialized knowledge, but does not explain why the trial court could not properly credit the officer's statement that his recognition of the characteristics of an armed gunman was based in part on his experience.)[20]

---

[19] *See Bell v. District of Columbia*, 132 A.3d 854, 858 (D.C. 2015); *In re T.M.*, 155 A.3d 400, 405 (D.C. 2017) ("Under the test for plain error, appellant must show error, that is 'plain,' that affected [his] substantial rights, and that seriously affects the fairness, integrity, or public reputation of judicial proceedings.")

[20] T.B. asserts that the government has conceded that the officers' testimony was improper, but we disagree. The government's brief refers to the officers'

We do not agree that *King* precludes a police officer from giving lay-opinion testimony that is based on their experience if it has also been a subject of their specialized training. As we said in *King*, lay-opinion testimony "results from a process of reasoning familiar in everyday life, whereas an expert's testimony results from a process of reasoning which can be mastered only by specialists in the field." *Id.* at 682 (quoting Fed. R. Evid. 701 advisory committee's note to 2000 amendment (quoting *State v. Brown*, 836 S.W.2d 530, 549 (Tenn. 1992)). Thus, in considering whether an officer's opinion is admissible as a lay opinion, "a court must focus on the reasoning process by which a witness reached his proffered opinion." *Id.* (quoting *United States v. Garcia*, 413 F.3d 201, 215 (2nd Cir. 2004) (internal quotation marks omitted)).[21] We held in *King* that where officers offer opinions based on their personal experiences and observations interacting with individuals in the D.C. streets while investigating crimes, a proper foundation can be laid for the officers' opinion testimony "grounded in perceptions gained through

---

"purportedly expert opinion," states that Officer Moore's testimony was "properly admitted," and also explains (correctly) that Officer Laielli relied on both his experience and training to form his opinion. In addition, during oral argument, government counsel characterized the officers' testimony as expert testimony that was properly admitted since there was no lack-of-foundation objection.

[21] *See also King*, 74 A.3d at 682 (finding force in the "reasoning process" focus of *Garcia*, but not adopting the statement in *Garcia* (on which T.B. relies) that a law enforcement agent may not testify as a lay witness to an opinion based "in whole or in part[] on his specialized training").

their personal experiences." *Id.* at 682-83 (noting that "the reasoning process the officers employed to interpret the street language was the everyday process of language acquisition").

In this case, it seems quite possible that the reasoning process Officer Laielli employed was a non-complex process that is "familiar in everyday life": the process of noting the correlation between certain observed behaviors—here, the flashing of a waistband (by individuals the officer had encountered during his three years with the MPD, including his work as part of the Sixth District Crime Suppression Team investigating firearms) and the carrying of a firearm (confirmed upon pat-down or frisk).[22] In other words, it seems possible that "the officer's knowledge was formed through his simple, personal observations of human conduct in his every day work" investigating firearms. *King*, 74 A.3d at 683; *see also id.* at 681 (noting that this court has allowed police officers to offer lay

---

[22] "Although the officer's professional experience . . . gave him the unique opportunity to regularly observe" the results of pat-downs, "what ultimately made the testimony lay testimony was the fact that the officer's knowledge was formed through his simple, personal observations of human conduct in his every day work." *King*, 74 A.3d at 683.

Officer Moore testified that in his (less than three) years as an MPD officer, including nine months as a member of the Crime Suppression Team investigating firearms and narcotic sales, he had been involved in "well over a hundred" firearm investigations and had recovered about the same number of firearms. Officer Laielli did not say how many firearms he had recovered, but, given the two officers' similar tenure with MPD ("coming up on three years"), we surmise it was about the same number as Officer Moore had recovered.

testimony "about the event in question based on their observation of similar events during their professional experience" (citing, inter alia, *Harris v. District of Columbia*, 601 A.2d 21, 23 (D.C. 1991) (holding that the trial court did not err in admitting police officers' lay-witness testimony that "based on their experiences dealing with persons under the influence of drugs, they believed that [the defendant] was under the influence of some substance"))).

T.B. could properly have raised a lack-of-foundation objection to Officer Laielli's testimony since the officer did not describe in any detail his reasoning process or his experience, but T.B.'s counsel raised no such objection. In the absence of such an objection, we conclude that the Superior Court did not plainly err in admitting Officer Laielli's opinion testimony about what he recognized as a characteristic of an armed gunman, which he said was based on his "experience" as a crime suppression officer. *See Reavis v. United States*, 395 A.2d 75, 79 (D.C. 1978) ("Even if the proffered evidence is infirm the trial judge does not err by admitting it in the absence of a timely objection to its admissibility unless to admit it is plain error.").

## VI. Conclusion

For the foregoing reasons, the judgment of delinquency, based on T.B.'s involvement in CPWL and UA, is

*Affirmed.*